ORIGINAL



# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| RICHARD SHARIF as agent for SOAD WATTAR, HAIFA KAJ and RAGDA SHARIFEH; WAQAR and SHAFQUT KHAN; and ABDUL and SHAHEEN RASHID, §§§§§ Plaintiffs, § v. § § WELLNESS INTERNATIONAL NETWORK, LTD a/k/a WIN; WIN NETWORK, INC.; RALPH OATS; CATHY OATS and SHERI MATTHEWS, §§§§§§ Defendants. § | Civil Action No. **3-05 CV-1367 B** |

## COMPLAINT

**COME NOW,** Richard Sharif as agent for Soad Wattar ("Sharif"), Haifa Kaj ("Kaj"), Ragda Sharifeh ("Sharifeh"), Waqar and Shafqut Khan ("Khans"), and Abdul and Shaheen Rashid ("Rashids") (collectively "Plaintiffs"), by and through their undersigned counsel, as and for its complaint against Wellness International Network, Ltd., a/k/a WIN ("Wellness"); WIN Network, Inc. ("WINN"), Ralph Oats; Cathy Oats and Sheri Matthews (collectively "Defendants"), and hereby allege as follows:

### IMPORTANT PREFATORY NOTE

Plaintiffs in the above-captioned case are presently appealing to the United States Court of Appeals for the Seventh Circuit a decision of the district court in the Northern District of Illinois entered on May 5, 2005 in case numbers 02 C 3047 (Sharif) and 02 C 5801 (Rashid and Khan) by which plaintiffs' claims against the defendants in the above-captioned case were dismissed for lack of jurisdiction pursuant to a forum selection clause contained in a contract signed by the plaintiffs.

In order to protect plaintiffs' claims against the running of any statutes of limitations, the plaintiffs are filing this complaint in the Northern District of Texas to protect their rights. Plaintiffs respectfully request that this action be stayed until such time as the

Court of Appeals for the Seventh Circuit renders a decision in the presently pending appeal.

## NATURE OF THE CASE

1.      The defendants in this complaint conduct a multimillion dollar criminal operation from coast to coast, including in Texas. This lawsuit centers on that operation, a so-called "multi-level marketing network," that is actually an unlawful pyramid scheme violating both the criminal and civil laws of Texas as well as federal criminal and civil laws. It involves, among other things, the encumbering of the plaintiffs and the other victims of the said scheme with so-called "distributor" contracts that are (1) really pyramid investment contracts, (2) legally void and (3) as exploited by the defendants, entirely fraudulent and unconscionable. It also involves efforts by the defendants to disguise the unlawful nature of this pyramid scheme through the use of innocent-sounding "Rules and Regulations" and other written materials that are directly at odds with the way the pyramid scheme is really operated and are intended to disguise the actual facts and the unlawful nature of that operation.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000. The Sharif plaintiffs are Illinois residents. The Khan plaintiffs are Wisconsin residents. The Rashid plaintiffs are Pennsylvania residents. None of the defendants are residents or business entities of Illinois, Pennsylvania or Wisconsin.

3.      This Court has jurisdiction over counts III through VI (RICO) pursuant to 28 U.S.C. § 1331 (federal question) and under 18 U.S.C. § 1964(c).

COMPLAINT – PAGE 2
333340v1

4.    Venue in this district is proper because of a forum selection clause contained in the defendants' contract signed by the plaintiffs, and many of the acts complained of took place in this district. (*See* **Exhibit 1**, ¶ 24; **Exhibits 2 and 3**, ¶ 19.)

5.    This Court has supplemental jurisdiction over the remaining counts of the complaint under 28 U.S.C. § 1367.

## THE PARTIES

### The Plaintiffs

6.    Plaintiff Richard Sharif as agent for Soad Wattar, Haifa Kaj and Ragda Sharifeh (hereinafter "Sharif") is, and at all times relevant herein was, an Illinois resident. Wattar, Kaj and Sharifeh are all family members of Mr. Sharif and provided Mr. Sharif with the monies which were paid to the defendants in this case. Mr. Sharif signed the defendants' "Associate Application & Agreement Form" in May 1999 to become a "distributor" of products for defendant Wellness International Network, Ltd. ("Wellness"). This Associate Application & Agreement Form is appended hereto as **Exhibit 1** and is incorporated herein by reference.

7.    In deciding to sign the Associate Application & Agreement Form referred to in paragraph 6 and in deciding not to demand a refund of the money paid to Wellness, Mr. Sharif relied on (a) statements made by the Wellness distributors who recruited them; (b) statements made at presentations held by Wellness by defendants Ralph and Cathy Oats; and (c) literature published by Wellness -- all to the effect that they would be able to earn a lot of money by joining what the defendants called the "Wellness family" through the retail sale of Wellness products and the recruitment of other distributors into the Wellness operation. For example, Mr. Sharif relied on statements made by defendant Ralph Oats at a presentation in Rosemont, Illinois in May 1999. At this presentation, Ralph Oats repeatedly stressed to the audience that a Wellness distributor could make hundreds of thousands of dollars in "residual income" by

COMPLAINT – PAGE 3
333340v1

recruiting others into the Wellness program. Mr. Sharif was very impressed by these statements and relied on them in deciding to sign the Associate Application & Agreement Form.

8.      However, Oats omitted any mention of the need for distributors to "qualify" in order to receive these huge profits. It was only after Mr. Sharif signed the Associate Application & Agreement Form that he found out that unless his distributorship "qualified" each month, none of the much-touted "residual income" would be received. In order to "qualify," distributors were required to purchase thousands of dollars of additional products from Wellness each month -- regardless of whether they had sold any of the products already in their possession.

9.      Mr. Sharif, as agent for Soad Wattar, Haifa Kaj and Ragda Sharifer, invested $424,803.06 to enter into the Wellness operation as a "Presidential Roundtable" member. This entire investment, plus thousands of additional dollars in storage and other expenses, was lost. Mr. Sharif also lost an additional $65,000 due to an unauthorized wire transfer of funds by Wellness.

10.     Plaintiffs Dr. Waqar and Shafqut Khan are, and at all relevant times herein were, residents of Wisconsin. The Khans signed the Wellness "Distributor Application & Agreement Form" in June 2000 to become a "distributor" of products for Wellness. This Distributor Application & Agreement Form is appended hereto as **Exhibit 2** and is incorporated herein by reference. (The Associate Application & Agreement Form and Distributor Application & Agreement Form signed by the plaintiffs are substantially similar in all relevant respects. For simplicity, any reference in this complaint to "Wellness contract(s)" is a reference to each of these Agreements.)

11.     In deciding to sign the Wellness contract referred to in paragraph 10 and in electing not to demand a refund of their money, the Khans relied on (a) statements made by the

COMPLAINT – PAGE 4
333340v1

Wellness distributors who recruited them; (b) statements made at presentations held by Wellness by defendants Ralph and Cathy Oats; and (c) literature published by Wellness -- all to the effect that they would be able to earn a lot of money by joining what the defendants called the "Wellness family" through the retail of sale of Wellness products and the recruitment of other distributors into the Wellness operation. For example, the Khans relied on statements made by defendant Ralph Oats at a presentation in Rosemont, Illinois in July 2000. At this presentation, Ralph Oats repeatedly stressed to the audience that a Wellness distributor could make hundreds of thousands of dollars in "residual income" by recruiting others into the Wellness program.

12. However, Oats and the other speakers omitted any mention of the need for distributors to "qualify" in order to receive these huge profits. It was only after the Khans signed the Wellness contract that they found out that unless their own distributorship "qualified" each month, none of the much-touted "residual income" would be received. In order to "qualify," distributors were required to purchase thousands of dollars of additional products from Wellness each month -- regardless of whether they had sold any of the products already in their possession.

13. The Khans invested $266,400 to enter into the Wellness operation as a "Presidential Roundtable" member. They lost their entire investment, plus thousands of additional dollars in storage and other expenses.

14. Plaintiffs Dr. Abdul and Shaheen Rashid are, and at all relevant times herein were, residents of Pennsylvania. The Rashids signed the Wellness "Distributor Application & Agreement Form" in December 1999 to become a "distributor" of products for Wellness. This Distributor Application & Agreement Form is appended hereto as **Exhibit 3** and is incorporated herein by reference.

COMPLAINT – PAGE 5
333340v1

15.     In deciding to sign the Wellness contract referred to in paragraph 14, the Rashids

relied on (a) statements made by the Wellness distributors who recruited them; (b) statements

made at presentations held by Wellness by defendants Ralph and Cathy Oats; and (c) literature

published by Wellness -- all to the effect that they would be able to earn a lot of money by

joining what the defendants called the "Wellness family" through the retail of sale of Wellness

products and the recruitment of other distributors into the Wellness operation.  For example, the

Rashids relied on statements made by defendant Ralph Oats at a presentation in Rosemont,

Illinois in or about late November or early December 1999.  At this presentation, Ralph Oats

repeatedly stressed to the audience that a Wellness distributor could make hundreds of thousands

of dollars in "residual income" by recruiting others into the Wellness program.  The Rashids

were very impressed by these statements and relied on them in deciding to sign the Wellness

contract.

16.     However, Oats omitted any mention of the need for distributors to "qualify" in

order to receive these huge profits.  It was only after the Rashids signed the Wellness contract

that they found out that unless their own distributorship "qualified" each month, none of the

much-touted "residual income" would be received.  In order to "qualify," distributors were

required to purchase thousands of dollars of additional products from Wellness each month --

regardless of whether they had sold any of the products already in their possession.

17.     The Rashids invested $239,000 to enter into the Wellness operation as a

"Presidential Roundtable" member.  They lost their entire investment, plus thousands of

additional dollars in storage and other expenses.

**The Defendants**

18.     Defendant Wellness is and at all times relevant herein was a limited partnership headquartered in Plano, Texas, and may be served with process at the following address: 5800 Democracy Drive , Plano, Texas 75024.  Wellness is continuing to operate its illegal pyramid scheme in the State of Texas and across the United States at the present time, in violation of the criminal and civil laws of Texas.

19.     Defendant WIN Network, Inc. is a Colorado corporation that is, and at all times relevant herein was, the Managing General Partner of Wellness, thereby controlling Wellness, and may be served with process at the principal office street address listed in the records of the Colorado Secretary of State 5800 Democracy Drive, Plano, Texas 75024 or, in the alternative, by serving its registered agent: CT Corporation, 1675 Broadway, Denver, Colorado 80202.

20.     Defendant Ralph Oats, a Texas resident, is the founder of Wellness and is and at all times relevant herein was the head of Wellness, controlling both it and defendant WIN Network, Inc., of which he is President, and may be served with process at the following address: 5800 Democracy Drive , Plano, Texas 75024.  Ralph Oats hosts many of the seminars designed to recruit distributors into the Wellness program, and regularly contributes to the quarterly newsletter which Wellness distributes to all of its distributors.  In the WIN System For Success Manual, that is a required purchase of every distributor, Ralph Oats is identified as "[t]he dominant force behind the explosive growth of WIN [and] an integral part of Wellness International Network."

21.     Defendant Cathy Oats, a Texas resident, is the wife of defendant Ralph Oats and at all times relevant herein has been Secretary of WIN Network, Inc. and an important official in the implementation of the Wellness program who also speaks at Wellness seminars and

COMPLAINT – PAGE 7
333340v1

presentations and regularly contributes to the quarterly newsletter which Wellness distributes to all of its distributors. In the <u>WIN System For Success Manual</u>, that is a required purchase of every distributor, Cathy Oats is identified as "[t]he dominant force behind the explosive growth of WIN [and] an integral part of Wellness International Network," and may be served with process at the following address: 5800 Democracy Drive , Plano, Texas 75024

22.     Defendant Sheri Matthews, a Texas resident, is and at all times relevant herein was Director of Distributor Relations and Compliance for Wellness and an important official in the implementation of the Wellness scheme, and may be served with process at the following address: 5800 Democracy Drive , Plano, Texas 75024. Matthews was the official who dealt with the complaints of the plaintiffs and other distributors and was responsible for denying the refund requests of the plaintiffs.

<b><u>FACTUAL BACKGROUND</u></b>

23.     Wellness touted itself as a multi-level marketing operation for the distribution of health and personal care products. Essentially, however, the plaintiffs and other distributors were and are investors who purchase the chance to earn investment returns -- based almost entirely on the efforts of others -- through their pyramiding success.

24.     In connection with the offer and sale of the Wellness contracts to the plaintiffs, the Wellness defendants, directly or through others, systematically made and caused to be made to the plaintiffs various untrue and deceptive statements and other untrue, inaccurate and misleading representations of material facts, and systematically omitted other material facts, including that, contrary to the defendants' propaganda, most distributors in the Wellness operation lost money.

COMPLAINT – PAGE 8
333340v1

25.     The plaintiffs were unaware of the foregoing facts when they executed the Wellness contracts referred to in paragraphs 6, 10 and 14 which are FORM contracts. The contract terms were not negotiable in any respect. They are contracts of adhesion. The same is true of the Wellness Rules & Regulations which are incorporated into the contract.

26.     The plaintiffs signed their respective Wellness contracts believing they would be able to earn money through the retail sale of products and through the recruitment of the many doctors with whom they were acquainted.

27.     Each of the plaintiffs attended presentations hosted by defendants Ralph and Cathy Oats, including presentations given by Ralph Oats at the Multi-Level Marketing College (the "MLM College") in Dallas, Texas. At all of these presentations, Ralph Oats made similar misrepresentations. Among these misrepresentations were the following:

a) Wellness distributors made tens of thousands of dollars each month. In this regard, Oats would choose people out of the audience who would then stand up and tell the members of the audience that they were earning anywhere from $10,000 to $120,000 each month;

b) Wellness was a "hands-on" company that cared about its distributors and that distributors would receive all of the guidance and assistance necessary to make the plaintiffs successful;

c) Oats omitted any mention of the need for each distributor to pay thousands of dollars each month in order to "qualify" for bonus and commissions; and

d) Wellness was not a pyramid scheme and was perfectly legal.

28.     Moreover, the legality of the Wellness program was held out to all distributors and to others in a blanket manner in the "WIN System For Success" manual -- a required purchase by all distributors -- as follows:

COMPLAINT – PAGE 9
333340v1

### *"Is Network Marketing Credible and Legal?"*

The answer to this question is, "Yes!" The FTC/Amway decision in 1979
Proved that once and for all."

(WIN System For Success at 2-4; emphasis in original.)

29.    At each of the presentations attended by the plaintiffs at which Ralph Oats was

the main speaker, Oats stressed the need to enter the Wellness operation at a high rank.  The

plaintiffs were told that doing so would allow them to "maximize your potential to earn money."

Oats stated in each of the presentations attended by the plaintiffs that the way they would get

"promoted" in the Wellness operation business was to either "buy into a high rank" or to "recruit

people."  The plaintiffs were told by Oats that if they came into the Wellness program at a high

rank, *i.e.*, paid more money to Wellness upfront, they would receive higher discounts on

Wellness products and would receive higher "immediate income" based on the distributors they

recruited into the Wellness program.

30.    Oats referred to the idea of "buying into a high rank" as "qualifying."  But he

never used the term "qualifying" as a way of informing distributors, including the plaintiffs, that

they would have to pay Wellness a certain amount each month in order to receive the much-

touted "residual income," i.e., bonuses, royalties and commission.  This latter type of

"qualifying" is described above in paragraphs 8, 12 and 16.

31.    This was an important part, if not the *most* important part, of the defendants'

scheme because it allowed the defendants to collect large sums of money upfront which were not

in any way based on or connected to the retail sale of Wellness products.

32.    The defendants were also able to extract large upfront sums from the plaintiffs

and other victims through the misleading and false testimonials given at seminars and

presentations like those staged in Rosemont, Illinois and the MLM College in Dallas and referred

COMPLAINT – PAGE 10
333340v1

to in paragraphs 7, 11 and 15. After stating how much they were earning a month, the chosen speakers would then tell the audience that they had entered the program at lower levels but almost immediately increased their investment when they realized how much money they could make by being at a higher level. The speakers would then tell the audience not to make the same mistake and to enter into the Wellness operation at the highest level they could afford.

33.     It was tactics like these that led the plaintiffs to pay the defendants more than $995,000 to join the Wellness operation.

34.     The statements referred to above were misleading and false because, plaintiffs believe, these speakers did not earn anywhere near the amounts they touted to the audience, and all of these amounts, if made, were made from unlawful activity in violation of Texas law.

35.     The extent to which the Wellness defendants lied and deceived on this point is exemplified by distributor-investor Bob Lange. Mr. Lange was presented in a Wellness publication that is appended hereto as **Exhibit 4** and incorporated herein by reference, as an example of a person who had made a great deal of money as a Wellness distributor, when, in fact, Mr. Lange had only been a Wellness distributor for one week at that time and had not enjoyed any such success. In fact, Mr. Lange has never made any money as a Wellness distributor and, to the contrary, ended up losing a great deal of money as a distributor-investor.

36.     Perhaps the most glaring example of the defendants' fraud appears in the WIN Today quarterly newsletter for the first quarter of 2000 appended hereto as **Exhibit 5** and incorporated herein by reference. On page 25 of the newsletter the Rashid plaintiffs are listed as the number one "Top Newcomer" for November 1999 "Based on Personal Group Retail Sales Volume in their Qualifying Month." But this ranking could not have been based on any "Retail Sales" because the Rashids *never* sold *any* of the Wellness products. Moreover, the Rashids did

COMPLAINT – PAGE 11
333340v1

not even sign their Wellness contract until December 4, 1999. This representation is clearly misleading because distributors and potential distributors see these rankings and believe that Wellness distributors are actually retailing Wellness products which leads to the belief that the Wellness program is not based primarily on recruiting others and that it actually works. However, that is not the case.

37.   Similarly, Volume VIII of the WIN Today newsletter (Fourth Quarter 2000) names plaintiff Waqar Khan as the "Monthly Top Producer" June 2000. (See **Exhibit 6** appended hereto and incorporated herein by reference.) But, like the case with the Rashid plaintiffs, the Khans never sold any of the Wellness products. In fact, he only signed the Wellness contract on June 18, 2000. This representation is misleading for the same reasons alleged in paragraph 37.

38.   Plaintiffs know for a fact that several of the distributors held out as similar successes in other newsletters, were not successful by any means or measure.

39.   These deceptions referred to above were hugely successful in getting victims to invest well beyond their means. They were so successful that many Wellness victims who did not have the large amounts of cash necessary to become distributors paid for investments of up to $20,000 with credit cards.

40.   The plaintiffs and other victims of the Wellness scheme were also persuaded into making these large upfront investments through the use of the Wellness Compensation Plan. By manipulating this convoluted and ever-changing Compensation Plan, which according to the Wellness Rules & Regulations could be, and in fact often was, amended unilaterally by the defendants at any time and in any way, without prior notice, the defendants were able to paint a

false picture of the profits to be earned through the Wellness scheme. These changes greatly benefited the defendants but were extremely harmful to the plaintiffs and other distributors.

41.     For example, in January 2001 the defendants unilaterally implemented a new Compensation Plan by which the defendants placed a $20,000 limit on the amount of product a distributor could "download" to a newly recruited distributor. Prior to this change, if the plaintiffs (or another distributor) recruited a person into the Wellness operation at a cost of $100,000, the plaintiffs could have "downloaded" $100,000 of their inventory to the new recruit. After this change, the plaintiffs were allowed to "download" only $20,000 of their inventory to the new recruit and the remaining $80,000 would have to be purchased from Wellness.

42.     This change in the Compensation Plan greatly benefited the defendants -- and caused great harm to the plaintiffs and other distributors -- because, using the example set forth in paragraph 40, not only would new recruits now have to pay $80,000 to the defendants instead of the distributor -- the plaintiffs and other distributors were now forced to recruit more new distributors just to make their money back.

43.     This new Compensation Plan was not an "amendment" or a "modification" as is permitted in the Rules & Regulations; rather, it was an entirely new plan which bore no resemblance to the Compensation Plan that was in effect when the plaintiffs signed their Wellness contracts. It changed the ranks, commissions, bonuses and downloading structure all to the detriment of the plaintiffs and other distributors and to the great benefit of the defendants and was directly contrary to Ralph Oats' rhetoric that Wellness was committed to the success of its individual distributors alleged above.

44.     Moreover, in the rare instance where a distributor did achieve some success (which was not the case with the plaintiffs), the income that he or she actually received was

COMPLAINT – PAGE 13
333340v1

much less than what had been promised in the Compensation Plan. The Wellness Compliance Department, of which defendant Sheri Matthews is the head, provides no guidance or explanation as to how the Compensation Plan actually works and there is no way for a new distributor to know how much compensation should be received. The plaintiffs were told only that as they brought in recruits, they would become more familiar with the Wellness operation, and how the Compensation Plan worked would become more clear.

45.     In addition, the Compensation Plan is set up in a way that significant amounts of commissions that should rightfully go to a new distributor are diverted instead to the new distributor's sponsor and that sponsor's sponsor, and so on. This is how people at the top of the pyramid, like Ralph Oats and Cathy Oats, end up keeping most of the money.

**The Wellness Operation Is A Classic Pyramid Scheme**

46.     Pursuant to Section 17.46(b)(21) of the Texas Deceptive Trade Practices and Consumer Protection Act, "promoting a pyramid promotional scheme" is unlawful.

47.     Section 17.461(a)(6) defines a "pyramid promotional scheme" as

"a plan or operation by which a person gives consideration for the opportunity to receive compensation that is derived primarily from a person's introduction of other persons to participate in the plan or operation rather than from the sale of a product by a person introduced into the plan or operation."

48.     Section. 17.461(c) provides:

(c) A person commits an offense if the person contrives, prepares, establishes, operates, advertises, sells, or promotes a pyramid promotional scheme. An offense under this subsection is a state jail felony.

49.     The Wellness operation was conceived as, and has been operated as an illegal pyramid scheme from the beginning. It is an unlawful pyramid sales scheme evidenced by the fact that the participating distributor pays money to Wellness and in turn receives (1) the right to earn rewards primarily for recruiting other participants into the scheme, and (2) the right to earn

COMPLAINT – PAGE 14
333340v1

commissions when persons they recruited into the scheme in turn recruit new participants, in an endless pyramid chain.

50.      The true structure and operation of Wellness is a classic pyramid scheme in which the distributors are really investors trained to focus their efforts on recruiting new participants rather than on selling products -- which is discouraged.

51.      In fact, Ralph Oats effectively admits the Wellness program is an unlawful pyramid scheme in widely distributed Wellness videos featuring him.  In one such video he states:

> "What we're about is introducing products to people.  **We are not about selling.** We're using the opportunity to give products to people and those people can come back to the company and get their product.  So, **we're not about selling,** and that's what most people think it is, but that's not what it's about.  It's about sharing an opportunity with people based upon giving them the products first." (Excerpt from videotape "WIN Opportunity With Ralph Oats")

52.      In that same videotape, Oats states:

> Now, our economy works like this:  **Now every time you bring a person into the business, you have to understand, that six people are going to earn on what that person did.**  So, if you look at the slide up there, right down at the bottom number six, six people will get paid.  You will get paid on those six people.  What you do, six people will earn money.

> "And it's fairly simply **'cause it's not about sales**.  It's about sharing the product."

> "Now, what we've done with the Five-Step Program is we have taken the words 'can't sell' out of your vocabulary.  **This is not about selling.**"

> "Now, I'm going to talk to you about a real simple formula that you can put together for yourself and I'm going to share it with you tonight just to show you how simple it is....  So I'm going to start out.  **My goal is to get five people.** What I understand is that out of those 5 people, not all of them are gonna really want to build a business.  Some of them are going to want to be users.  I don't really know, but I know I could teach them how to do it.  **Now, if I can get those five people just to go out and get three people,** maybe they aren't doing as well as I've done, but still they're doing all they can do.  It doesn't make any difference.  It's what we keep telling you.  All you can do is all you can do.  All

COMPLAINT – PAGE 15
333340v1

you can do is enough if you understand the concept. On our second tier, as Cathy [Oats] likes to call it, your grandkids. **This is you on the top, on the first level. The second level is your grandkids. So now you have 15 grandkids in your organization. Now the third tier if they just continue doing what they were doing you're looking at 135 people on the fourth tier....**"

53.     In the videotape <u>Balanced Program – Ralph Oats</u>, Oats makes it clear that any

compensation to be earned through a Wellness distributorship is not at all based on the sale of

product, but on recruiting others to participate in the Wellness operation:

> "I am telling you that all of you who are doing that [holding meetings to learn and inform about the products] are guilty as sin of getting yourself set up in a product business and you guys and gals who are getting swept up in this thing to go and do all these product information meetings and all that, all that you are doing is meeting there and getting people excited about the product **but you are not recruiting anybody and I will tell you why you are not recruiting anybody --** because you are laying the knowledge out on these people and they are going to buy the product and the next thing you know is that you are going to talk to them about the opportunity and they are just going to talk the product like they are supposed to talk the product. **I am telling you in front of god, the camera and everyone that you are going about the business the wrong way. You are getting swept up in product, product, product and I know that two or three people in this company are absolutely wearing out having [product] meetings with them and don't get paid for it. Quit doing it. Don't do it.**"

54.     Ralph Oats also told the audience at a June 2002 presentation in

Rosemont, Illinois that:

> "If you do not do the five step program you will have to rely on selling. And if that's the case, you are less likely to make any money. Why would you want to rely on selling when doing the five step program and having those under you duplicate that will make you wealthy?"

The "five step program" referred to above is set forth in the <u>WIN System For Success</u> manual

and is appended hereto as **Exhibit 7** and incorporated herein by reference.

55.     The real objective of the defendants' scheme is pyramiding and not the sale or

distribution of their products, which is also shown by the fact that Wellness solicits and accepts

as distributors persons who have no basis or structure for retailing Wellness products. For

example, one such investor, who invested hundreds of thousands of dollars to become a Wellness

distributor, owns a plumbing company; another is an attorney. In one of Wellness's quarterly

newsletters which is distributed by the defendants to all distributors, the relevant portion of

which is appended hereto as **Exhibit 8** and incorporated herein by reference, a C.P.A. and

management consultant who was a Wellness distributor-investor is discussed as follows:

> "Now nearly two years later, Kamal is applying the same drive and determination
> that catapulted him to success in his previous profession to his WIN business. He
> has since become a familiar face among the company's monthly Top Producers,
> achieving earnings in excess of $45,000 in a single month, and now aspires to
> earn half a million dollars by the end of the year. **And with 11 people in his**
> **downline** already qualified for the Cruise 2000, Kamal estimates his
> organizational sales volume to be nearing $4 million. 'I feel secure with the
> power of residual income and the continuing growth of my organization,' explains
> Kamal, who understands that **geometric progression is a powerful force in**
> **network marketing. 'We didn't get the hundreds, we got a couple who went**
> **out and got a couple and got a couple. Now we have hundreds.'** (Emphasis
> added.)

56.     In a similar vein, at seminars held across the country, a "Hypothetical Business

Plan" is passed out to the audience. This "Business Plan" states as follows:

> "By using geometric progression for demonstration purposes. You introduce five
> referrals who introduce five others who introduce five others."

The "Hypothetical Business Plan" is appended hereto as **Exhibit 9** and is incorporated herein by

reference.

57.     Another indication of the defendants' blatant lack of regard for selling their

products is what happened to plaintiff Richard Sharif when he sold a very small amount of

Wellness products without recruiting the purchasers into the Wellness operation. Mr. Sharif was

chastised by defendant Sheri Matthews who told him that the real purpose of the Wellness

operation was not to sell the products to the public, but to get new distributors into the Wellness

chain.

58.     Similarly, when Mr. Sharif ran an advertisement on the internet for retail sales of Wellness products, he was stopped by legal action taken by Wellness and was told by defendant Matthews that Wellness would not allow him to advertise Wellness in any independent manner. While the reason given for this position was the protection of intellectual property rights, the real reason was the intention to force distributors into recruiting others into the Wellness operation, i.e., pyramiding.

59.     Yet another indication of the defendants' blatant lack of regard for selling their products is the fact that they routinely ship products to their distributors which have expired "use by dates" and then, when distributors complain about this or want fresh products, the defendants either deny the requests or the distributor is referred to Rule F-12 which states that the desired exchange must occur within 30 days of the invoice date.

60.     Yet another indication of the defendants' lack of concern with the sale of its products is the cost of those products. Wellness routinely prices its products two to three times higher than the price of very similar products that are available over-the-counter in drug stores and pharmacies. By pricing the products in this manner, Wellness effectively prevents the retail sale of any of those products. Thus, the only way for a distributor to dispose of his or her products is to recruit new distributors by stressing the "opportunity."

61.     Moreover, the shipping and handling costs for the products to be shipped to distributors are based on the cost of the product and not the product's weight or volume, resulting in exorbitant shipping and handling costs.

## The Deceptive Rules & Regulations

62.     The contracts signed by the plaintiffs provide (¶ 3):

I HAVE READ THE WIN RULES & REGULATIONS AND I AGREE THAT THEY ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT

IN PRESENT FORM AND THAT THEY ALSO MAY BE AMENDED BY WIN FROM TIME TO TIME.

63.     The Rules & Regulations themselves are nothing more than window dressing intended to give the false impression that Wellness is a legal multilevel marketing operation. The Rules & Regulations are appended hereto as **Exhibit 10** and incorporated herein by reference.

64.     For example, Rule F-2 provides:

**"Stockpiling discouraged**.  The success of WIN depends on retail consumers; therefore all forms of stockpiling are discouraged.  WIN recognizes that distributors may wish to purchase products in reasonable amounts for their own use and for the purpose of provisioning new distributors as they are sponsored. However, WIN strictly prohibits the purchase of products in unreasonable amounts solely for the purpose of qualification or advancement in the compensation plan."

65.     As is alleged throughout this Complaint, the "success of WIN" does not in any way depend on "retail consumers."  Moreover, distributors **did** purchase products from Wellness "solely for the purpose of qualification or advancement in the compensation plan."  As alleged in paragraphs 30-33, the plaintiffs and other distributors were repeatedly encouraged to come into the Wellness program at the highest level they possibly could.  The plaintiffs and other distributors were told in seminars, presentations and in audio and videotapes licensed by Wellness that they would never be able to recoup the money they could have made had they come into the Wellness program at the highest level possible.  In other words, distributors were told to purchase products in order to "advance in the Compensation Plan."

66.     Additionally, in direct contradiction with the language of Rule F-2, distributors were required to purchase more products from Wellness "solely for the purpose of qualification...."  The plaintiffs and all distributors were and are continually pushed by the defendants to engage in inventory loading, meaning to invest more and more in the purchase of

COMPLAINT – PAGE 19
333340v1

products, even though the retail sale of the products is not the objective of the Wellness scheme

and even though the products originally purchased were not sold or downloaded to new recruits.

Such inventory loading is necessary in order for a distributor to attain the "qualification" amount,

i.e., the monthly performance requirement, in order to receive residual income. In keeping with

the defendants' manner of running the Wellness operation, the required qualification amount

constantly fluctuated.

> 67.     Moreover, as alleged in paragraphs 8, 12, 16 and 31, the plaintiffs were not told of

the "qualification" amount at any time prior to signing their respective Wellness contracts, nor at

any subsequent seminars or presentations. They were not told that "qualification" referred to a

monthly performance requirements,. The plaintiffs consequently believed that once they had

"qualified" to join the Wellness program at a particular rank, that was all that was required of

them in terms of product purchases. The need to reach the qualification amount is covered in the

WIN System For Success manual, but the plaintiffs and other distributors do not receive this

manual until two to three weeks after signing the Wellness contracts. This same ruse is played

on all distributors, who get caught in a vicious cycle of either having to continue to purchase

more and more product from Wellness or forfeit any commissions, bonuses or royalties they

might be entitled to receive.

> 68.     Another deception of the defendants' scheme is the application and enforcement

of the so-called "70 Percent Rule." WIN Rules & Regulations F-4 and F-5. The presence of the

70 Percent Rule in the Rules & Regulations is merely window dressing intended to give the

appearance of compliance with Federal Trade Commission regulations. Rules F-4 and F-5

provide:

> **"70 Percent Rule.**  WIN strictly enforces the provisions of product repurchases.
> In order to purchase product from WIN, the distributor must certify on the product

COMPLAINT – PAGE 20
333340v1

order form that he/she has sold, sampled (to induce sales to retail customers) or consumed at least 70 percent of all products previously purchased." Rule F-4

**"70 Percent Rule Enforcement.** WIN has adopted, implemented, maintained and enforced in its distribution system a policy and practice whereby Win will require distributors to provide verification of their compliance with Rule-F-4...." Rule F-5

69.     These Rules were rarely, if ever, enforced. The plaintiffs are not aware of **any** distributor who was required to "certify... that he/she had sold, sampled (to induce sales to retail customers) or consumed" **any** percentage of product previously purchased before the defendants would ship him/her more products. That these Rules were not enforced is also established by the fact that distributors were required to qualify (by purchasing additional products) each month in order to receive commissions, bonuses and royalties.

70.     The defendants also constantly changed the price that distributors had to pay for products, resulting in a devaluation of the products that the plaintiffs and other distributors purchased. These price changes, together with the constant changes in the Compensation Plan, caused the plaintiffs to lose credibility in the eyes of prospective candidates who had shown an interest in joining the Wellness operation.

**The Defendants Committed Hundreds of Predicate Acts**

71.     In carrying out their illegal pyramid scheme, the defendants committed hundreds of predicate acts, including the following:

(a) The defendants solicited and directed plaintiff Richard Sharif to mail his executed Wellness contract to the defendants on or about May 27, 1999. This solicitation is contained in the Wellness contract itself, states the mailing address as "WELLNESS INTERNATIONAL NETWORK, LTD. 1501 Luna Road, Bldg. #102 Carrollton, Texas 75006" and directs the applicant to go through a checklist "Before mailing this application" to that address. (Exhibit 1)

COMPLAINT – PAGE 21
333340v1

(b)  The defendants solicited and directed the Khan plaintiffs to mail their executed Wellness contract to the defendants on or about June 20, 2000.  This solicitation is contained in the Wellness contract itself, states the mailing address as "WELLNESS INTERNATIONAL NETWORK, LTD. 5800 Democracy Drive, Plano, Texas, 75024" and directs the applicant to go through a checklist "Before mailing this application" to that address.  (Exhibit 2)

(c)  The defendants solicited and directed the Rashid plaintiffs to mail their executed Wellness contract to the defendants on or about December 4, 1999.  This solicitation is contained in the Wellness contract itself, states the mailing address as "WELLNESS INTERNATIONAL NETWORK, LTD. 5800 Democracy Drive, Plano, Texas, 75024" and directs the applicant to go through a checklist "Before mailing this application" to that address.  (Exhibit 3)

(d)  On or about June 25, 2000, Dr. Khan mailed to the defendant at the same address stated above in paragraph 72(b) a "U.S. Product Order Form" requesting $300,376 in products. (See **Exhibit 11** appended hereto and incorporated herein by reference.)

(e)  The defendants also publish and cause to be mailed to hundreds (if not thousands) of Wellness distributors, including the plaintiffs, a quarterly newsletter entitled <u>WIN TODAY</u>. Defendants Ralph and Cathy Oats are regular contributors to these newsletters.  The defendants have caused these newsletters to be mailed in or about January, April, July and October of each year since at least sometime in 1998 and continuing to the present.  Many, if not all, of these quarterly newsletters contain deceptive and fraudulent information and promotional statements. For example, in Volume VIII of <u>WIN TODAY</u> (fourth quarter of 2000) distributor Waqar Khan is deceptively held out as a "Monthly Top Producer" for June 2000.  (See **Exhibit 6**.)  In fact, Dr. Khan only became a Wellness distributor on June 18, 2000 and did not earn any profit in June 2000; rather, at that time he paid to Wellness over $242,000 for his distributorship.  Dr.

COMPLAINT – PAGE 22
333340v1

Khan has never earned more than a very nominal amount of money from his work as a Wellness distributor. In fact, Dr. Khan has lost all but $1,000 of the more than $265,000 he ultimately paid to the defendants for his distributorship.

(f) Another example of the defendants' use of the mails to perpetuate their fraudulent conduct appears in the <u>WIN Today</u> quarterly newsletter for the first quarter of 2000. On page 25 of the newsletter the Rashid plaintiffs are listed as the number one "Top Newcomer" for November 1999 "Based on Personal Group Retail Sales Volume in their Qualifying Month." But this ranking could not have been based on any "Retail Sales" because the Rashids *never* sold *any* of the Wellness products. Moreover, the Rashids did not even sign their Wellness contract until December 4, 1999. (See **Exhibit 5**)

(g) Yet another example of a fraudulent newsletter sent through the U.S. mail to hundreds (if not thousands) of distributors is Volume VI of <u>WIN TODAY</u> (fourth quarter of 1998). In this newsletter, as is alleged in paragraph 36, Robert and Eunice Lange are deceptively held out as "Top Producers Based on Personal/Group Retail Sales Volume" who earned over $330,000. In fact, Mr. Lange has never made any money as a Wellness distributor and, to the contrary, ended up losing a great deal of money as a distributor. (See **Exhibit 4**)

(h) Another example of a fraudulent newsletter sent through the U.S. mail to hundreds (if not thousands) of distributors is Volume VIII of <u>WIN TODAY</u> (first quarter of 2000) which is appended hereto as **Exhibit 6** and incorporated herein by reference. In this newsletter, distributor Pratima Muzumdar is deceptively held out as a "Top Newcomer Based on Personal Group Sales Volume in their Qualifying Month" for December 1999. In fact, Ms. Muzumdar never made any money from her Wellness distributorships. To the contrary, she lost a great deal of money because of her association with Wellness.

COMPLAINT – PAGE 23
333340v1

(i) The defendants also publish and cause to be sent through the U.S. mail to hundreds (if not thousands) of Wellness distributors another quarterly newsletter entitled WINner's Update. The defendants have caused these newsletters to be mailed in or about January, April, July and October of each year since at least sometime in 1999.

72.     Throughout the relevant period in this Complaint, the defendants (i) trained all the distributors, (ii) told them what to say in their recruitment of new distributors, (iii) filled distributors' minds, including the minds of the plaintiffs, with phony success stories and other lies about the Wellness operation, (iv) tightly controlled the distributors' recruitment actions, and (v) in an attempt to insulate themselves from liability for the actions of the distributors (and notwithstanding the foregoing facts set forth in this paragraph) falsely pretended and contended that all of the said distributors were and are "independent distributors" when, in fact, the said distributors are by no means independent.  The defendants continue to operate in the manner described in this Complaint at the present time.

## DAMAGES SUSTAINED

73.     By reason of the foregoing facts, the plaintiffs have been damaged in excess of $995,000 to which interest must be added.

## COUNT I
### [To Declare Plaintiffs' Wellness Contracts Void For
### Violating The Texas Deceptive Trade Practices Act and Public Policy]

74.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

75.     Section 17.461(a)(6) of the DTPA defines a "pyramid promotional scheme" as

"a plan or operation by which a person gives consideration for the opportunity to receive compensation that is derived primarily from a person's introduction of other persons to participate in the plan or operation rather than from the sale of a product by a person introduced into the plan or operation."

COMPLAINT – PAGE 24
333340v1

76.     Section 17.461(c) of the DTPA provides:

(c) A person commits an offense if the person contrives, prepares, establishes, operates, advertises, sells, or promotes a pyramid promotional scheme. An offense under this subsection is a state jail felony.

77.     The Wellness program described above is a "pyramid promotional scheme" within the meaning of this statute.

78.     In this regard, plaintiffs point out that the defendants' pyramid scheme contemplates large numbers of ongoing violations of the Texas statute quoted above, because the scheme contemplates and requires that all of its distributors recruit others into the scheme.

79.     By reason of the foregoing facts, the plaintiffs' Wellness contracts that are appended hereto as Exhibit Nos. 1, 2, and 3 are, and at the time of their execution were, null and void as contrary to Texas law and public policy.

<u>**COUNT II**</u>
**[To Declare Plaintiffs' Wellness**
**Contracts Void Under Contract Law]**

80.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

81.     The Wellness contract signed by the plaintiffs provides as follows:

I HAVE READ THE WIN RULES & REGULATIONS AND I AGREE THAT THEY ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT IN PRESENT FORM AND THAT THEY ALSO MAY BE AMENDED BY WIN FROM TIME TO TIME.

82.     This provision renders the contract unconscionable and void because Wellness can unilaterally, and without prior notice, change the plaintiffs' and other distributors' Wellness contracts at any time.

83.     Wellness has repeatedly invoked this provision to change the terms of the original contracts in very substantial respects, to the material detriment of the plaintiffs and other distributors.

84.     The facts set forth in this count constitute a second reason why the "contracts" should be held void; the said contracts are not contracts because one party to them, Wellness, can change them without limitation and without reason or notice.

## COUNT III
### [For Violation of the Texas Deceptive Trade Practices Act]

85.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

86.     The defendants are operating and promoting an unlawful pyramid scheme within the meaning of Sections 17.46(b)(21) and 17.461(a)(6) of the DTPA.

87.     As a direct and proximate result of the said unlawful conduct, the defendants defrauded the plaintiffs of over $995,000 and defrauded hundreds if not thousands of other victims of the defendants' unlawful scheme of millions of dollars.  These losses entitle the plaintiffs to recover treble damages from the defendants under § 17.50(b)(1) of the DTPA and their costs of suit, plus reasonable attorneys fees, pursuant to § 17.50(d) of the DTPA.

## COUNT IV
### [Civil RICO, 18 U.S.C. § 1962(a)]

88.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

89.     Each of the plaintiffs is a "person" as that term is defined in 18 U.S.C. § 1961(3) and 18 U.S.C. § 1964(c).

90.    Each of the defendants is a "person" as that term is defined in 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(a).

91.    Defendant Wellness International Network, Ltd. itself constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that engaged in illegal activities affecting interstate and foreign commerce.

92.    Alternatively, all of the defendants form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) that engaged in illegal activities affecting interstate and foreign commerce.

93.    During the period 1994 and continuing to the present date, each of the defendants knowingly and willingly conducted or participated in the conduct of the affairs of the said enterprises by their conduct described above, which included multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, including but not limited to the mailings and telefaxes alleged above in paragraph 72. These transmissions include, but are not limited to, letters, solicitation and promotional materials, brochures, applications for distributorships, videos and other material transmitted to the plaintiffs and/or to other participants and prospective participants in the Wellness pyramid scheme. These transmissions contain numerous fraudulent misrepresentations and material omissions and were transmitted to the plaintiffs and others with the intention of (i) defrauding the plaintiffs and other participants in the defendants' unlawful pyramid scheme; and (ii) perpetuating and expanding that scheme.

94.    Each of the defendants did use or invest, directly or indirectly, income derived from the pattern of unlawful activity to operate, maintain control of and maintain an interest in the unlawful enterprises alleged in paragraphs 92 and 93 in violation of 18 U.S.C. § 1962(a).

95.     This conduct constituted a pattern of racketeering activity which affected, and which continues to affect to the present time, interstate commerce within the meaning of 18 U.S.C. § 1961(5).

96.     The acts alleged in this count IV all occurred after the enactment of RICO, and within ten years of one another.

97.     As a direct and proximate result of the said unlawful conduct, the defendants through the said enterprises defrauded the plaintiffs of over $215,800 and defrauded hundreds if not thousands of other victims of the defendants' unlawful scheme of millions of dollars.  These losses entitle the plaintiffs to recover treble damages from the defendants, and their costs of suit, plus reasonable attorneys fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT V
### [Civil RICO, 18 U.S.C. § 1962(b)]

98.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

99.     Through the pattern of racketeering activity alleged herein, the defendants have acquired and/or maintained, directly or indirectly, an interest and/or control of the unlawful enterprises alleged above in paragraphs 92 and 93 in violation of 18 U.S.C. § 1962 (b).

100.    The acts alleged in this count V all occurred after the enactment of RICO, and within ten years of one another.

101.    As a direct and proximate result of the said unlawful conduct, the defendants through the said enterprises defrauded the plaintiffs of over $995,00 and defrauded hundreds if not thousands of other victims of the defendants' unlawful scheme of millions of dollars.  These losses entitle the plaintiffs to recover treble damages from the defendants, and their costs of suit, plus reasonable attorneys fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT VI
### [Civil RICO, 18 U.S.C. § 1962(c)]

102.    Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

103.    Through the pattern of racketeering activity alleged herein, each of the individual defendants is employed by and/or associated with the enterprises alleged in paragraphs 92 and 93 and each of the defendants, including the corporate defendants, conducts and/or participates, directly or indirectly, in the conduct of the enterprises alleged in paragraphs 92 and 93 in violation of 18 U.S.C. § 1962(c).

104.    The acts alleged in this count VI all occurred after the enactment of RICO, and within ten years of one another.

105.    As a direct and proximate result of the said unlawful conduct, the defendants through the said enterprises defrauded the plaintiffs of over $995,000 and defrauded hundreds if not thousands of other victims of the defendants' unlawful scheme of millions of dollars. These losses entitle the plaintiffs to recover treble damages from the defendants, and their costs of suit, plus reasonable attorneys fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT VII
### [Civil RICO, 18 U.S.C. § 1962(d)]

106.    Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

107.    Each of the defendants conspired to violate 18 U.S.C. §§ 1962(a), (b) and (c) in violation of 18 U.S.C. § 1962(d) in the manner alleged above in this Complaint. The defendants engaged in this conspiratorial course of conduct with the intention of defrauding the plaintiffs and hundred if not thousands of other participants in the defendants unlawful pyramid scheme.

108.    The acts alleged in this count VII all occurred after the enactment of RICO, and within ten years of one another.

109.    As a direct and proximate result of the said unlawful conduct, the defendants through the said enterprises defrauded the plaintiffs of over $995,000 and defrauded hundreds if not thousands of other victims of the defendants' unlawful scheme of millions of dollars. These losses entitle the plaintiffs to recover treble damages from the defendants, and their costs of suit, plus reasonable attorneys fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII
### [For Common Law Fraud]

110.    Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirety.

111.    By reason of the defendants' misrepresentations, omissions and other conduct alleged in this complaint, and the plaintiffs' reliance on said misrepresentations, omissions and other conduct, the defendants committed common law fraud against the plaintiffs in violation of Texas law. The defendants' fraudulent conduct was willful, wanton, oppressive and malicious for which the plaintiffs are entitled to punitive damages in an amount to be determined at trial.

112.    As a direct and proximate result of such misrepresentations, omissions and conduct, the plaintiffs suffered actual damages in the amount set forth above.

## COUNT IX
### [For Conspiracy Under Texas Law]

113.    Plaintiffs reallege all the foregoing paragraphs as though they were set forth here in their entirety.

114.   By reason of the foregoing facts, the defendants have conspired and agreed amongst themselves and with others unknown to plaintiffs and agreed to violate the rights of the plaintiffs under Texas law.

115.   As a direct and proximate result of such conduct, the plaintiffs suffered actual damages in the amount set forth above.

## RELIEF REQUESTED

WHEREFORE, plaintiffs pray for the following relief:

A.   For a judgment declaring the plaintiffs' contracts with Wellness void from their inception, and for an injunction prohibiting the defendants and anyone allied with them in any way from seeking to enforce the terms of those contracts against the plaintiffs;

B.   For a money judgment against the defendants, jointly and severally, in the amount of three times the total sum of the plaintiffs' actual and potential losses, damages and expenses stemming from or relating to their involvement in the Wellness scheme;

C.   For punitive damages in an appropriate amount to be included in the money judgment entered for the plaintiffs;

D.   For the plaintiffs' attorneys fees and costs and expenses of this lawsuit; and

E.   For such other relief as may be necessary or proper to make plaintiffs whole and fully compensate them for damages and losses, actual and potential, relating to the Wellness scheme.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

COMPLAINT – PAGE 31
333340v1

Respectfully submitted,

THE CARTER LAW FIRM, P.C.

E. Leon Carter
Texas Bar No. 03914300
5000 Quorum Drive, Suite 620
Dallas, Texas 75254
(469) 621-3700 (ph)
(469) 621-3706 (fax)

AND

THE ROBERT PLOTKIN LAW FIRM, P.C.

Robert Plotkin
Illinois Bar No. 2219719
Michael Curletti
Illinois Bar No. 6274765
17 North State Street, Suite 1700
Chicago, Illinois 60602
(312) 252-7306 (ph.)

ATTORNEYS FOR PLAINTIFFS

# ASSOCIATE APPLICATION & AGREEMENT FORM

**WELLNESS INTERNATIONAL NETWORK, LTD**
1501 Luna Road, Bldg. #102 • Carrollton, Texas 75006
Phone: (972) 245-1097 • http://www.winltd.com

Print Clearly (In Black Ink)                                    Faxed copies will not be accepted.

## Applicant Information

SOCIAL SECURITY NO. (Required - If Business, fill in S.S.N. or contact below) | 3 | 5 | 4 | 6 | 8 | 9 | 9 | 4 | 4 | This will become your WIN ID # in the Federal ID # below

NAME (Required - If Business, fill in name of contact) **SHARIF  RICHARD E**
(Last Name)                (First Name)          (M.I.)

CO-APPLICANT NAME _____
(Last Name)                (First Name)          (M.I.)

FEDERAL TAX ID NO. | | | | | | | |  (refer to #19 Terms of Agreement, reverse side)  BUSINESS NAME _____

MAILING ADDRESS **4341 N. Clarendale ST #1601**  CITY **Chicago**

STATE **FL** ZIP **60613**  COUNTY **Cook**  COUNTRY **USA**

TELEPHONE NO. RESIDENCE **(773) 248-1072**  BUSINESS **(773) 227-1761**

FAX NO. **(773) 227-7255**

## SECTION II - Sponsor Information

NAME OF SPONSOR(S) **MOHAMMAD A MOHIUDDIN MD**  WIN ID NO. | | | | | | | |  TO BE ASSIGNED

DUAL SPONSORED DISTRIBUTORSHIPS ONLY ▼

NAME OF SECONDARY SPONSOR(S) _____  WIN ID NO. | | | | | | | |
(A completed Dual Sponsoring Agreement must accompany this Associate Application.)

## SECTION III - Multiple Businesses

To be completed only if Applicant in Section 1 is applying for a second or third distributorship.

Primary Business WIN ID NO. | | | | | | | |  Check appropriate box: ☐ 2nd business  ☐ 3rd business

## SECTION IV - Shipping Address (If Different from Above - NO P.O. BOXES)

SHIPPING ADDRESS _____  CITY _____

STATE _____ ZIP _____  COUNTY _____  COUNTRY _____

TELEPHONE NO. (____) _____

## SECTION V - Direct Deposit Information - Required

The following information must be completed to receive commissions from WIN as all commissions must be rendered via direct deposit. I hereby authorize Wellness International Network, Ltd., ID number 75-2487033, to initiate credit entries and to initiate, if necessary, debit entries and adjustments for any credit entries in error to my account indicated below and the depository named below, hereinafter called DEPOSITORY, to credit and/or debit the same such account. I also understand that I will be charged a $6.00 service fee each time an automatic deposit is made into my account. I also understand that should WIN be unable to deposit my earnings due to inaccurately provided bank information by me, WIN will attempt to redeposit these funds upon notification by WIN's financial institution of such error, to the corrected bank account at a fee of $25 per retransmission.

Depository Name (Bank): _____  Branch or Location Name: _____

Bank Address: _____  City: _____  State: _____  Zip: _____

Telephone: _____  Account Number: _____  Routing Number: _____

REQUIRED: For checking account, must attach voided check for account listed (deposit slips will not be accepted). For savings account, attach savings deposit slip for account listed.

## SECTION VI - Credit Card/Debit Card Authorization - Required for Credit Card/Debit Card Use

I hereby authorize the following credit/debit cards (Visa or MasterCard only) to be used for present and future purchase obligations to Wellness International Network, Ltd. (WIN). I agree to perform the obligations set forth in the cardholder's agreement with the issuer and to be governed by WIN's Rules and Regulations. I understand that NO REFUNDS OR EXCHANGES will be granted. Applicant/Co-Applicant must be the authorized signer on all cards listed.

Card Number **4246 3112 0138 5066** Exp. Date: **7/99** Card Number _____  Exp. Date: ____/____

Print name as it appears on card **RICHARD SHARIF**  Print name as it appears on card _____

## SECTION VII - Method of Payment for $102.00 Fee (Non-refundable*)

☐ Personal Check* # _____  ☐ Cashier's/Certified Check  ☐ Wire Transfer**:  WIN's Compass Bank Acct. # 0000237 • ABA Routing # 113010547 • Attn: Dallas Office

☐ Money Order  ☒ Credit Card/Debit Card**  Card Number **4246 3112 0138 5066**  Exp. **07/99**

Name as it Appears on Card **RICHARD SHARIF**

* $25 fee on all returned checks.
** If wire transfer, please include wire transfer information. If credit card/debit card, information must be listed in Section VI above.

## SECTION VIII - Signatures

I hereby acknowledge that I have read this entire contract front and back, NOTABLY TERMS NUMBERED 3, 6, 7, 10, 20, 23, 24 and 25, and all information contained in Sections I - VII above. I understand there is no requirement beyond the filing of this application with the appropriate fee to become a WIN Independent Marketing Associate (IMA).

NOTE: Agreement is not valid unless all parties of each distributorship have signed.

Applicant's Signature _[signature]_  (Applicant must personally sign here.)  Date **04-29-99**

Co-Applicant's Signature _[signature]_  (Co-Applicant must personally sign here.)  Date _____

Sponsor's Signature(s) _[signature]_ (If applicable)  (Co-Applicant)  Date _____

Secondary Sponsor's Signature(s) _____ (If applicable)  (Co-Applicant)  Date _____

Before mailing this application, please be sure you:
– have completed sections I-VIII in their entirety
– have obtained all necessary signatures
– have attached a voided check or savings deposit slip
– include your social security number
– have personally signed this contract
– enclose a $102.00 payment (*non-refundable except where otherwise required by law) plus applicable sales tax to WIN

Associate Application

|||||||||||||||
8 1 0

In #310                                                                                          rev. 6/19/98

97 Wellness International Network, Ltd.  Original Copy - WIN CORPORATE OFFICE  Yellow Copy - SPONSOR'S COPY  Pink Copy - SECONDARY SPONSOR'S COPY  Gold Copy - APPLICANT'S COPY

EXHIBIT 1

## TERMS OF AGREEMENT

...become an Independent Marketing Associate (hereinafter "IMA") of Wellness International Network, Ltd. (hereinafter "WIN"). As an ...representative of WIN, I understand and agree to the following terms (hereinafter the "Agreement"):

...legal age in the state of my residency.

...become an IMA upon acceptance of this application by WIN and will, at that time, have the right to sell WIN products in accordance with the WIN ...Compensation Plan.

...HAVE READ THE WIN RULES AND REGULATIONS AND I AGREE THAT THEY ARE INCORPORATED BY REFERENCE INTO THIS ...AGREEMENT IN PRESENT FORM AND THAT THEY ALSO MAY BE AMENDED BY WIN FROM TIME TO TIME. I ALSO UNDERSTAND ...THAT WIN RESERVES THE RIGHT TO AMEND THE WIN COMPENSATION PLAN FROM TIME TO TIME. ANY SUCH AMENDMENTS WILL ...BE PUBLISHED IN THE APPROPRIATE COMPANY LITERATURE.

No purchase of WIN products or services is necessary to become a WIN IMA other than the purchase of a WIN System For Success, which is sold at company ...cost and contains sales materials not for resale. ** My becoming an IMA does not constitute the sale of a franchise or a distributorship, and no fees or ...investment other than the WIN System For Success have been or will be required from me for the right to market WIN products pursuant to this Agreement.

5.   As a WIN IMA, I am a wholly independent marketing representative, who establishes and services my customers as an independent contractor. This ...Agreement is not intended and shall not be construed to create a relationship of employer employee, agency, partnership or joint venture between myself ...and any other IMA, sponsor(s) or WIN. I understand and agree that WIN reserves no right to control or direct my efforts as an IMA, other than the right ...to question results.

6.   AS AN IMA, I UNDERSTAND AND AGREE THAT THE LIABILITY OF WIN AND OF ITS RELATED PARTIES (DEFINED BELOW) TO ME, ...MY SUCCESSORS AND MY ASSIGNS FOR ANY CLAIM WHATSOEVER RELATED TO THIS AGREEMENT OR THE BUSINESS RELATION- ...SHIP ESTABLISHED BY THIS AGREEMENT, SHALL NOT EXCEED, AND SHALL BE LIMITED TO, THE AMOUNT OF ANY UNSOLD WIN ...PRODUCT INVENTORY OWNED BY ME. IN NO EVENT SHALL WIN OR ITS RELATED ENTITIES BE LIABLE TO ME FOR ANY ...INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES. "RELATED PARTIES" MEANS ENTITIES RELATED ...TO WIN AND WIN'S OWNERS, DIRECTORS, OFFICERS, EMPLOYEES AND PARTNERS, IN BOTH THEIR REPRESENTATIVE CAPACITY ...AND INDIVIDUALLY. "CLAIM" INCLUDES, BUT IS NOT LIMITED TO, ANY CAUSE OF ACTION SOUNDING IN CONTRACT, STATUTE, ...TORT OR STRICT LIABILITY.

7.   I CERTIFY THAT NEITHER WIN NOR MY SPONSOR(S) HAS MADE ANY CLAIMS OF GUARANTEED EARNINGS OR REPRESENTATIONS ...OF ANTICIPATED EARNINGS THAT MIGHT RESULT FROM MY EFFORTS AS AN IMA. I UNDERSTAND THAT MY SUCCESS AS AN IMA ...IS DIRECTLY DEPENDENT ON MY OWN EFFORTS IN RETAIL SALES, SERVICE, AND THE DEVELOPMENT OF A MARKETING ...NETWORK. I UNDERSTAND AND AGREE THAT I WILL MAKE NO STATEMENTS, DISCLOSURES OR REPRESENTATIONS IN SELLING ...WIN'S GOODS AND SERVICES OR IN THE SPONSORING OF OTHER PROSPECTIVE IMAS OTHER THAN THOSE CONTAINED IN ...APPROVED WIN LITERATURE.

8.   The term of this Agreement is one year. This Agreement will be renewed upon my timely payment of the annual WIN IMA renewal fee which is more ...fully described in the WIN Rules and Regulations.

9.   I am entitled to resign my participation in the WIN Compensation Plan at any time by giving notarized, written notification to WIN. Voluntary resignation ...may be forwarded to affected parties. I understand that WIN may involuntarily terminate my IMA status in accordance with the Rules and Regulations ...if I violate the terms of this agreement or the WIN Rules and Regulations. I understand and agree that WIN reserves the right to assure continued services ...to my customers if I cease to be a WIN IMA.

10.  RESIGNATION RETURNS – WIN DOES NOT REPURCHASE PRODUCT EXCEPT IN ACCORDANCE WITH APPLICABLE STATE LAW.

11.  I understand that I have no power or authority to incur any debt, obligation or liability on behalf of WIN in any manner or for any purpose.

12.  I understand and agree that I will not be treated as an employee with respect to my services for WIN as a WIN IMA for federal or state tax purposes, including, ...but not limited to, the Federal Insurance Contributions Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding at source, ...or for any federal, state or local tax laws. It is my responsibility and I agree to pay self-employment, local, state and federal income taxes as required by ...law.

13.  I understand and agree to honor WIN's 100% unconditional money-back guarantee to all retail customers, which states that any retail customer who is ...dissatisfied with any WIN product for any reason may return the product to me, within thirty (30) days of the purchase from me, for either a replacement ...or a full refund of the purchase price. I understand that the WIN Corporate Office will replace the returned product to me (at no cost to me), provided that ...all conditions of WIN's Rules & Regulations (Retail Customer Returns) are met. I further understand that WIN will not refund to me the purchase price ...of any retail customer returns.

14.  I understand and agree that all orders submitted to WIN shall be accompanied by money order, cashier's check, a copy of a bank's verification of wire ...transfer, personal check or credit card information for the full amount due. I understand that all orders are subject to acceptance by WIN and the terms of ...this Agreement.

15.  I will not use the WIN trade name, logo, copyrighted material, trademarks or service marks except as materials provided by WIN. I understand that ...unauthorized use or duplication of WIN trademarks, trade names or copyrighted materials is a violation of federal law. Upon termination of this Agreement, ...for any cause or reason, I agree to immediately discontinue using all trade names, trademarks, service marks, printed literature, sales aids and film or video, ...sales presentations theretofore provided me by the Company and understand and agree that any violation of this clause will render me liable to the Company ...for infringement of its trade names, trademarks, service marks, copyrights and trade materials.

16.  I agree to ensure that any prospective IMA sponsored or (dual) sponsored by me receives the WIN Rules and Regulations and the WIN Compensation Plan ...prior to submission of the Associate Application and Agreement and I understand that I am responsible for training and supporting the IMAs I sponsor into ...WIN.

17.  I am the only WIN IMA in my immediate family or household and I do not hold a beneficial interest in any other WIN distributorship entity.

18.  I understand that I cannot sell my WIN distributorship except under restrictions contained in the WIN Rules and Regulations.

19.  Corporations, partnerships and/or trusts may be signed as IMAs of WIN ONLY when the Associate Application and Agreement is accompanied by notarized ...copies of:

    1)   Articles of incorporation, partnership agreement or trust documents as filed with the State.

    2)   To ensure compliance with WIN's Rules & Regulations (Corporations, Partnerships and Trusts), IMAs must disclose a complete list of all ...directors, officers and shareholders involved in the corporation. Partnerships must disclose all general and limited partners. Trusts must disclose ...beneficiaries.

    3)   Proof must be provided of a Federal ID Number and a copy of the Annual Certification from the Secretary of State of the State of Partnership ...Registration or Incorporation.

20.  ANY DISPUTE OR CLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR WITH RESPECT TO THIS BUSINESS ...RELATIONSHIP ESTABLISHED BY THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION CONDUCTED IN ACCOR- ...DANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. SUCH ARBITRATION SHALL BE CONDUCTED IN ...DALLAS COUNTY, TEXAS. THE SCOPE OF THIS PROVISION SHALL EXTEND NOT ONLY TO DISPUTES OR CLAIMS BROUGHT BY THE ...IMA WHICH ENCOMPASSES ENTITIES RELATED TO WIN AND WIN'S OWNERS, DIRECTORS, OFFICERS, EMPLOYEES AND PARTNERS, ...IN BOTH THEIR REPRESENTATIVE CAPACITY AND INDIVIDUALLY.

21.  This agreement constitutes the entire Agreement between WIN and myself and no other promises, representations, guarantees or agreements, nor alterations, ...modifications or changes, of any kind, shall be valid unless in writing and signed by both parties, except as provided herein.

22.  I agree that WIN may use my name, likeness, voice, biographical information and the material supplied by me for purposes of advertising, publicity and ...sales promotion; this will not violate the rights of any person or organization and will not incur any liability for payment to any person or organization.

23.  I UNDERSTAND THAT I MAY APPLY TO BECOME A DUAL SPONSORED DISTRIBUTOR ONLY IF THIS AGREEMENT IS ACCOMPANIED ...BY A COMPLETED DUAL SPONSORING AGREEMENT. I ALSO UNDERSTAND THAT I WILL BECOME A DUAL SPONSORED DISTRIBU- ...TOR WHEN I HAVE ATTAINED THE EFFECTIVE RANK OF MANAGER OR ABOVE IN THE WIN COMPENSATION PLAN.

24.  THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS. JURISDICTION AND VENUE OVER ANY DISPUTES ...ARISING OUT OF THIS AGREEMENT SHALL BE PROPER ONLY IN THE FEDERAL OR STATE COURTS IN DALLAS COUNTY, TEXAS.

25.  COUNTERPARTS: THIS AGREEMENT MAY BE EXECUTED IN ONE OR MORE COUNTERPARTS, ALL OF WHICH SHALL BE CONSIDERED ...ONE AND THE SAME AGREEMENT AND SHALL BECOME EFFECTIVE WHEN ONE OR MORE COUNTERPARTS HAVE BEEN SIGNED BY ...EACH OF THE PARTIES.

** Optional in some states.

A PARTICIPANT IN THIS MULTI-LEVEL MARKETING PLAN HAS THE RIGHT TO CANCEL AT ANY TIME, REGARDLESS OF REASON. ...NOTARIZED CANCELLATION MUST BE SUBMITTED IN WRITING TO WIN AT ITS PRINCIPAL PLACE OF BUSINESS.



# DISTRIBUTOR APPLICATION & AGREEMENT FORM

WELLNESS INTERNATIONAL NETWORK, Ltd.
5800 Democracy Drive • Plano, Texas 75024
Phone: (972) 312-1100 • http://www.winltd.com

**Please Print Clearly (In Black Ink)**                    **Faxed copies will not be accepted.**

## SECTION I - Distributor Information

SOCIAL SECURITY NO. (Required - If Business, fill in S.S.N. of contact below) | 3 | 9 | 0 | 8 | 4 | 5 | 0 | 8 | 3 | (This will become your WIN ID# unless a Federal ID# listed)

NAME (Required - If Business, fill in name of contact) __Khan__ __Waqar__
                                     (Last Name)                    (First Name)              (M.I.)

CO-APPLICANT SOCIAL SECURITY NO. (Required - If co-applicant is listed) | | | | | | | | | |

CO-APPLICANT NAME __Khan__ __Shafqut__
                          (Last Name)                    (First Name)              (M.I.)

FEDERAL TAX ID NO. | 3 | 9 | 1 | 8 | 7 | 1 | 7 | 6 | 3 |   BUSINESS NAME __Bismila LLC__
              (refer to #19 Terms of Agreement, reverse side)

MAILING ADDRESS __618 Lakeshore Dr__                    CITY __Beaver Dam__

STATE __WI__ ZIP __53916__ -_____   COUNTY __Dodge__   COUNTRY __USA__

TELEPHONE NO. RES. (920) 887 - 3583   BUSINESS (920) 885 - 4747   FAX (920) 887 - 3745

## SECTION II - Sponsor Information

NAME OF SPONSOR(S) __Salma Akhtar III__   WIN ID NO. | 0 | 0 | 0 | 1 | 1 | 1 | 6 | 7 | 3 |

**DUAL SPONSORED DISTRIBUTORS ONLY**

NAME OF SECONDARY SPONSOR(S) _____   WIN ID NO. | | | | | | | | |
(A completed Dual Sponsoring Agreement must accompany this Distributor Application.)

## SECTION III - Multiple Businesses

*To be completed only if Distributor in Section 1 is applying for a second or third distributorship.*

Primary Business WIN ID NO. | | | | | | | | |   Check appropriate box: ☐ 2nd business ☐ 3rd business

## SECTION IV - Shipping Address (If Different from Above - NO P.O. BOXES)

SHIPPING ADDRESS _____   CITY _____

STATE_____ ZIP_____ -_____   COUNTY _____   COUNTRY _____

TELEPHONE NO. (_____)_____

## SECTION VII - Method of Payment for $102.00 Fee (Non-refundable*)

☐ Personal Check* #_____   ☐ Cashier's/Certified Check   ☐ Wire Transfer**: WIN's Compass Bank Acct. # 00050237 • ABA Routing # 113010547 •
                                                              Attn: Dallas Office
☐ Money Order   ☐ Credit Card/Debit Card** [Visa] [logo]   Card Number 5424 1801 1324 8154   Exp. 9 / 02
Name as it Appears on Card __WAQAR A. KHAN__
* $25 fee on all returned checks.
**If wire transfer, please include wire transfer information. If credit card/debit card, information must be listed in Section VI above.

## SECTION VIII - Signatures

I hereby acknowledge that I have read this entire contract front and back, NOTABLY TERMS NUMBERED 3; 6; 7; 10; 19, 21; and 22, and all information contained in Sections I - VII above. I understand there is no requirement beyond the filing of this application with the appropriate fee to become a WIN Independent Distributor.

NOTE: Agreement is not valid unless all parties of each distributorship have signed.

✗ Distributor's Signature _____   Date 6.18.20__
                          (Distributor must personally sign here.)

Co-Applicant's Signature __Shafqut A. Khan__   Date 6 -18 - 2__
                          (Co-Applicant must personally sign here.)

Sponsor's Signature(s) __Salma Akhtar__   SALMA   AKHTAR   Date 6-2__ ___
                          (Applicant)

Secondary Sponsor's Signature(s) _____   RIAZ A AKHTAR   Date 6.2c ____
                          (Co-Applicant)

Before mailing this application, be sure you:
✓ have completed sections I- VIII in their entirety
✓ have obtained all necessary signatures
✓ have attached a voided check or savings deposit slip (no brokerage accounts accepted)
✓ include your social security number
✓ include the social security number of your co-applicant (omission of this will result in the co-applicant being omitted from the distributorship)
✓ have personally signed this contract
✓ enclose a $102.00 payment (*non-refundable except where otherwise required by law) plus applicable sales tax to WIN

**Distributor Application**

5 1 0

Code #510                                                                                     rev. 8/9/99

© 1999 Wellness International Network, Ltd    Original Copy - WIN CORPORATE OFFICE   Yellow Copy - SPONSOR'S COPY   Pink Copy - SECONDARY SPONSOR'S COPY   Gold Copy - APPLICANT'S COPY

EXHIBIT 2

TERMS OF AGREEMENT

I hereby apply to become an Independent Distributor (hereinafter "Distributor") of Wellness International Network, Ltd. (hereinafter "WIN" or the "Company").
As an independent representative of WIN, I understand and agree to the following terms (hereinafter the "Agreement"):

1. I am of legal age in the state of my residency.
2. I will become a Distributor upon acceptance of this application by WIN and will, at that time, have the right to sell WIN products in accordance with the WIN Compensation Plan.
3. I HAVE READ THE WIN RULES & REGULATIONS AND I AGREE THAT THEY ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT IN PRESENT FORM AND THAT THEY MAY ALSO MAY BE AMENDED BY WIN FROM TIME TO TIME. IN THE EXTENT THAT THERE ARE ANY CONFLICTS BETWEEN THIS AGREEMENT AND THE WIN RULES & REGULATIONS, THE WIN RULES & REGULATIONS SHALL GOVERN. I ALSO UNDERSTAND THAT WIN RESERVES THE RIGHT TO AMEND THE WIN COMPENSATION PLAN FROM TIME TO TIME. ANY SUCH AMENDMENTS WILL BE PUBLISHED IN THE APPROPRIATE COMPANY LITERATURE.
4. No purchase of WIN products or services is necessary to become a WIN Distributor other than the purchase of a WIN System For Success, which is sold at company cost and contains sales materials not for resale. My becoming a Distributor does not constitute the sale of a franchise, a distributorship, or the sale of goods and no fees or investment other than the WIN System For Success have been or will be required from me for the right to market WIN products pursuant to this Agreement.
5. As a WIN Distributor, I am a wholly independent marketing representative, who establishes and services my customers as an independent contractor. This Agreement is not intended and shall not be construed to create a relationship of employer-employee, agency, partnership or joint venture between myself and any other Distributor, sponsor(s) or WIN. I understand and agree that WIN reserves no right to control or direct my efforts as a Distributor, except as set forth herein and in the WIN Rules & Regulations.
6. AS A DISTRIBUTOR, I UNDERSTAND AND AGREE THAT THE LIABILITY OF WIN TO ME, MY SUCCESSORS AND MY ASSIGNS FOR ANY CLAIM WHATSOEVER RELATED TO THIS AGREEMENT OR THE BUSINESS RELATIONSHIP ESTABLISHED BY THIS AGREEMENT, SHALL NOT EXCEED, AND SHALL BE LIMITED TO, THE AMOUNT OF ANY UNSOLD WIN PRODUCT INVENTORY OWNED BY ME. IN NO EVENT SHALL WIN BE LIABLE TO ME FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES. "CLAIM" INCLUDES, BUT IS NOT LIMITED TO, ANY CAUSE OF ACTION SOUNDING IN CONTRACT, STATUTE, TORT OR STRICT LIABILITY. IN ADDITION, ALL COVENANTS, DUTIES, OBLIGATIONS AND LIABILITIES OF WIN TO ANY DISTRIBUTOR SHALL BE THE SOLE RESPONSIBILITY OF WIN AND SHALL BE RECOURSE SOLELY TO WIN AND ITS ASSETS. UNDER NO CIRCUMSTANCES WHATSOEVER SHALL ANY OFFICERS, DIRECTORS, PARTNERS (GENERAL OR LIMITED), SHAREHOLDERS OF ANY GENERAL OR LIMITED PARTNER(S), EMPLOYEES, REPRESENTATIVES OR AFFILIATES OF WIN BE DEEMED PERSONALLY LIABLE FOR ANY COVENANTS, DUTIES, OBLIGATIONS OR LIABILITIES.
7. I CERTIFY THAT NEITHER WIN NOR MY SPONSOR(S) HAS MADE ANY CLAIMS OF GUARANTEED EARNINGS OR REPRESENTATIONS OF ANTICIPATED EARNINGS THAT MIGHT RESULT FROM MY EFFORTS AS A DISTRIBUTOR. I UNDERSTAND THAT MY SUCCESS AS A DISTRIBUTOR IS DIRECTLY DEPENDENT ON MY OWN EFFORTS IN RETAIL SALES, SERVICE, AND THE DEVELOPMENT OF A MARKETING NETWORK. I UNDERSTAND AND AGREE THAT I WILL MAKE NO STATEMENTS, DISCLOSURES OR REPRESENTATIONS IN SELLING WIN'S GOODS AND SERVICES OR IN THE SPONSORING OF OTHER PROSPECTIVE DISTRIBUTORS OTHER THAN THOSE CONTAINED IN APPROVED WIN LITERATURE.
8. The term of this Agreement is one year. This Agreement will be renewed upon my timely payment of the annual WIN Distributor renewal fee which is more fully described in the WIN Rules & Regulations.
9. I am entitled to resign my participation in the WIN Compensation Plan at any time by giving notarized, written notification to WIN. Voluntary resignation may be forwarded to affected parties. I understand that WIN may involuntarily terminate my Distributor status in accordance with the WIN Rules & Regulations if I violate the terms of this Agreement or the WIN Rules & Regulations. I understand and agree that WIN reserves the right to assure continued service to my customers if I cease to be a WIN Distributor.
10. RESIGNATION RETURNS - WIN DOES NOT REPURCHASE PRODUCT EXCEPT IN ACCORDANCE WITH APPLICABLE STATE LAW.**
11. I understand that I have no power of authority to incur any debt, obligation or liability on behalf of WIN in any manner or for any purpose.
12. I understand and agree that I will not be treated as an employee with respect to my services for WIN as a WIN Distributor for state or federal tax purposes, including, but not limited to, the Federal Insurance Contributions Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding at source or for any federal, state or local tax laws. It is my responsibility and I agree to pay self-employment, local, state and federal income taxes required by law.
13. I understand and agree that all orders submitted to WIN shall be accompanied by money order, cashier's check, a copy of a bank's verification of a wire transfer, personal check or credit card information for the full amount due. I understand that all orders are subject to acceptance by WIN and the terms of this Agreement and the WIN Rules & Regulations.
14. I will not use the WIN trade name, logo, copyrighted material, trademarks or service marks except in materials provided by WIN. I understand that unauthorized use or duplication of WIN trademarks, trade names or copyrighted materials is a violation of federal law, as well as WIN Rules & Regulations. Upon termination of this Agreement, for any cause or reason, I agree to immediately discontinue using all trade names, trademarks, service marks, printed literature, sales aids and film or video sales presentations theretofore provided me by the Company and understand and agree that any violation of this clause will render me liable to the Company for infringement of its trade names, trademarks, service marks, copyrights and trade materials.
15. I agree to ensure that any prospective Distributor sponsored or dual sponsored by me receives the WIN Rules & Regulations and the WIN Compensation Plan prior to submission of the Associate Application and Agreement and I understand that I am responsible for training and supporting the Distributor(s) I sponsor into WIN.
16. I understand, represent and warrant that the ownership of my WIN distributorship complies in all respects to WIN Rules & Regulations.
17. I understand that I cannot sell my WIN distributorship except under restrictions contained in the WIN Rules & Regulations.
18. Corporations, partnerships, and/or trusts may be signed as Distributors of WIN ONLY if they meet the terms and conditions of the WIN Rules & Regulations.
19. ANY DISPUTE OR CLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR WITH RESPECT TO THE BUSINESS RELATIONSHIP ESTABLISHED BY THIS AGREEMENT SHALL BE RESOLVED BY EITHER BINDING ARBITRATION CONDUCTED IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, OR BY A COURT OF COMPETENT JURISDICTION. ALL AS SET FORTH IN THE WIN RULES & REGULATIONS. ANY SUCH ARBITRATION OR LITIGATION IN A COURT OF COMPETENT JURISDICTION SHALL BE PROPER ON/BEFORE AN ARBITRATION PANEL CONVEYED, OR IN A STATE OR FEDERAL COURT PRESIDING, IN DALLAS, DALLAS COUNTY, TEXAS. IT BEING AGREED AND UNDERSTOOD BY EACH DISTRIBUTOR THAT THEY IRREVOCABLY AND UNCONDITIONALLY SUBMIT THEMSELVES AND THEIR PROPERTY TO THE NON-EXCLUSIVE JURISDICTION OF ANY ARBITRATION, PANEL CONVEYED, OR COURT OF COMPETENT JURISDICTION IN, DALLAS, DALLAS COUNTY, TEXAS, WHICHEVER IS APPLICABLE. THIS AGREEMENT, AS WELL AS THE WIN RULES & REGULATIONS, SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, UNITED STATES OF AMERICA, WITHOUT REGARD TO PROVISIONS GOVERNING CONFLICTS OF LAW.
20. I agree that WIN may use my name, likeness, voice, biographical information and the materials supplied by me for purpose of advertising, publicity and sales promotion; this will not violate the rights of any person or organization and will not incur any liability for payment to any person or organization.
21. I UNDERSTAND THAT I MAY APPLY TO BECOME A DUAL SPONSORED DISTRIBUTOR ONLY IF THIS AGREEMENT IS ACCOMPANIED BY A COMPLETED DUAL SPONSORING AGREEMENT. I ALSO UNDERSTAND THAT I WILL BECOME A DUAL SPONSORED DISTRIBUTOR WHEN I HAVE ATTAINED THE EFFECTIVE RANK OF MANAGER OR ABOVE IN THE WIN COMPENSATION PLAN.
22. COUNTERPARTS. THIS AGREEMENT MAY BE EXECUTED IN ONE OR MORE COUNTERPARTS, ALL OF WHICH SHALL BE CONSIDERED ONE AND THE SAME AGREEMENT AND SHALL BECOME EFFECTIVE WHEN ONE OR MORE COUNTERPARTS HAVE BEEN SIGNED BY EACH OF THE PARTIES.

**Optional in some states.

A PARTICIPANT IN THIS MULTI-LEVEL MARKETING PLAN HAS THE RIGHT TO CANCEL AT ANY TIME, REGARDLESS OF REASON.
NOTARIZED CANCELLATION MUST BE SUBMITTED IN WRITING TO WIN AT ITS PRINCIPAL PLACE OF BUSINESS.



# DISTRIBUTOR APPLICATION & AGREEMENT FORM

WELLNESS INTERNATIONAL NETWORK, LTD
5800 Democracy Drive • Plano, Texas 75024
Phone: (972) 312-1100 • http://www.winltd.com

**Please Print Clearly (In Black Ink)**                              **Faxed copies will not be accepted.**

## SECTION I - Distributor Information

SOCIAL SECURITY NO. (Required - If Business, fill in S.S.N. of contact below)  `0 1 9 4 4 2 5 5 7 8`  (This will become your WIN ID# unless a Federal ID# is listed)

NAME (Required - If Business, fill in name of contact) ___ RASHID ___ ABDUL ___
              (Last Name)         (First Name)     (M.I.)

CO-APPLICANT SOCIAL SECURITY NO. (Required - If co-applicant is listed)  `2 1 1 5 2 8 3 3 1`

CO-APPLICANT NAME ___ RASHID ___ SHAHEEN ___
              (Last Name)         (First Name)     (M.I.)

FEDERAL TAX ID NO. ___ (refer to #19 Terms of Agreement, reverse side)   BUSINESS NAME ___

MAILING ADDRESS _1770 TANGLEWOOD ROAD_   CITY _ORWIGSBURG_

STATE _PA_  ZIP _17961_ ___  COUNTY _Sch._   COUNTRY _USA_

TELEPHONE NO. RES. (_570_) _366_ . _1121_   BUSINESS (_570_) _622_ - _4209_   FAX (_570_) _366_ - _2241_

## SECTION II - Sponsor Information

NAME OF SPONSOR(S) _SALMA AKHTAR #2_   WIN ID NO. `[ | | | | | ]`

**DUAL SPONSORED DISTRIBUTORS ONLY** · _+ Please put in 2nd Co. - # not yet assigned_

NAME OF SECONDARY SPONSOR(S) ___   WIN ID NO. `[ | | | | | ]`
     (A completed Dual Sponsoring Agreement *must* accompany this Distributor Application.)

## SECTION III - Multiple Businesses

*To be completed only if Distributor in Section 1 is applying for a second or third distributorship.*

Primary Business WIN ID NO. `[ | | | | | ]`   Check appropriate box:  ☐ 2nd business   ☐ 3rd business

## SECTION IV - Shipping Address (If Different from Above - NO P.O. BOXES)

SHIPPING ADDRESS ___   CITY ___

STATE ___  ZIP ___ - ___  COUNTY ___  COUNTRY ___

TELEPHONE NO. (___)___

## SECTION VII - Method of Payment for $102.00 Fee (Non-refundable*)

☑ Personal Check* # _356_  ☐ Cashier's/Certified Check  ☐ Wire Transfer**: WIN's Compass Bank Acct. # 0050237 · ABA Routing # 113010547 · Attn: Dallas Office

☐ Money Order  ☐ Credit Card/Debit Card**  ☑ [VISA] [MC]  Card Number ___ - ___ - ___ - ___   Exp. ___/___

Name as it Appears on Card ___
* $25 fee on all returned checks.
**If transfer, please include wire transfer information. If credit card/debit card, information must be listed in Section VI above.

## SECTION VIII - Signatures

I hereby acknowledge that I have read this entire contract front and back, NOTABLY TERMS NUMBERED 3, 6, 7, 10, 19, 21, and 22, and all information contained in Sections I - VII above. I understand there is no requirement beyond the filing of this application with the appropriate fee to become a WIN Independent Distributor.

**NOTE:** Agreement is not valid unless all parties of each distributorship have signed.

Distributor's Signature _Abdul Rashid_   Date _12/4/99_
     (Co-Applicant must personally sign here.)

Co-Applicant's Signature X _Shaheen Rashid_   Date _14/4/99_
     (Co-Applicant must personally sign here.)

Sponsor's Signature(s) _Salma Akhtar_   Date _14/4/99_
     (Applicant)         (Co-Applicant)

Secondary Sponsor's Signature(s) ___   Date ___
     (Applicant)         (Co-Applicant)

**Before mailing this application, be sure you:**
✓ have completed sections I-VIII in their entirety
✓ have obtained all necessary signatures
✓ have attached a voided check or savings deposit slip (no brokerage accounts accepted)
✓ include your social security number
✓ include the social security number of your co-applicant (omission of this will result in the co-applicant being omitted from the distributorship)
✓ have personally signed this contract
✓ enclose a $102.00 payment (*non-refundable except where otherwise required by law) plus applicable sales tax to WIN

Distributor Application

**Code #510**
510

© 1999 Wellness International Network, Ltd   Original Copy – WIN CORPORATE OFFICE   Yellow Copy – SPONSOR'S COPY   Pink Copy – SECONDARY SPONSOR'S COPY   Gold Copy – APPLICANT'S COPY
rev. 8/9/99

EXHIBIT 3

TERMS OF AGREEMENT

I hereby apply to become an Independent Distributor (hereinafter "Distributor") of Wellness International Network, Ltd. (hereinafter "WIN" or the "Company"). As an independent representative of WIN, I understand and agree to the following terms (hereinafter the "Agreement"):

1. I am of legal age in the state of my residency.
2. I will become a Distributor upon acceptance of this application by WIN and will, at that time, have the right to sell WIN products in accordance with the WIN Compensation Plan.
3. I HAVE READ THE WIN RULES & REGULATIONS AND AGREE THAT THEY ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT IN PRESENT FORM AND THAT THEY ALSO MAY BE AMENDED BY WIN FROM TIME TO TIME. IN THE EXTENT THAT THERE ARE ANY CONFLICTS BETWEEN THIS AGREEMENT AND THE WIN RULES & REGULATIONS, THE WIN RULES & REGULATIONS SHALL GOVERN. I ALSO UNDERSTAND THAT WIN RESERVES THE RIGHT TO AMEND THE WIN COMPENSATION PLAN FROM TIME TO TIME. ANY SUCH AMENDMENTS WILL BE PUBLISHED IN THE APPROPRIATE COMPANY LITERATURE.
4. No purchase of WIN products or services is necessary to become a WIN Distributor other than the purchase of a WIN System For Success, which is sold at company cost and contains sales materials not for resale. Only becoming a Distributor does not constitute the sale of a franchise, a distributorship, or the sale of goods and no fees or investment other than the WIN System For Success have been or will be required from me for the right to market WIN products pursuant to this Agreement.
5. As a WIN Distributor, I am a wholly independent marketing representative, who establishes and services my customers as an independent contractor. This Agreement is not intended and shall not be construed to create a relationship of employer-employee, agency, partnership or joint venture between myself and any other Distributor, sponsor(s) or WIN. I understand and agree that WIN reserves no right to control or direct my efforts as a Distributor, except as set forth herein and in the WIN Rules & Regulations.
6. AS A DISTRIBUTOR, I UNDERSTAND AND AGREE THAT THE LIABILITY OF WIN TO ME, MY SUCCESSORS AND MY ASSIGNS FOR ANY CLAIM WHATSOEVER RELATED TO THIS AGREEMENT OR THE BUSINESS RELATIONSHIP ESTABLISHED BY THIS AGREEMENT, SHALL NOT EXCEED, AND SHALL BE LIMITED TO, THE AMOUNT OF ANY UNSOLD WIN PRODUCT INVENTORY OWNED BY ME. IN NO EVENT SHALL WIN BE LIABLE TO ME FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES. "CLAIM" INCLUDES, BUT IS NOT LIMITED TO, ANY CAUSE OF ACTION SOUNDING IN CONTRACT, STATUTE, TORT OR STRICT LIABILITY. IN ADDITION, ALL COVENANTS, DUTIES, OBLIGATIONS AND LIABILITIES OF WIN TO ANY DISTRIBUTOR SHALL BE THE SOLE RESPONSIBILITY OF WIN AND SHALL BE RECOURSE SOLELY TO WIN AND ITS ASSETS. UNDER NO CIRCUMSTANCES WHATSOEVER SHALL ANY OFFICERS, DIRECTORS, PARTNERS (GENERAL OR LIMITED), SHAREHOLDERS OF ANY GENERAL OR LIMITED PARTNER(S), EMPLOYEES, REPRESENTATIVES OR AFFILIATES OF WIN BE DEEMED PERSONALLY LIABLE FOR ANY COVENANTS, DUTIES, OBLIGATIONS OR LIABILITIES.
7. I CERTIFY THAT NEITHER WIN NOR MY SPONSOR(S) HAS MADE ANY CLAIMS OF GUARANTEED EARNINGS OR REPRESENTATIONS OF ANTICIPATED EARNINGS THAT MIGHT RESULT FROM MY EFFORTS AS A DISTRIBUTOR. I UNDERSTAND THAT MY SUCCESS AS A DISTRIBUTOR IS DIRECTLY DEPENDENT ON MY OWN EFFORTS IN RETAIL SALES, SERVICE, AND THE DEVELOPMENT OF A MARKETING NETWORK. I UNDERSTAND AND AGREE THAT I WILL MAKE NO STATEMENTS, DISCLOSURES OR REPRESENTATIONS IN SELLING WIN'S GOODS AND SERVICES OR IN THE SPONSORING OF OTHER PROSPECTIVE DISTRIBUTORS OTHER THAN THOSE CONTAINED IN APPROVED WIN LITERATURE.
8. The term of this Agreement is one year. This Agreement will be renewed upon my timely payment of the annual WIN Distributor renewal fee which is more fully described in the WIN Rules & Regulations.
9. I am entitled to resign my participation in the WIN Compensation Plan at any time by giving notarized, written notification to WIN. Voluntary resignation may be forwarded to affected parties. I understand that WIN may involuntarily terminate my Distributor status in accordance with the WIN Rules & Regulations if I violate the terms of this Agreement or the WIN Rules & Regulations. I understand and agree that WIN reserves the right to assure continued service to my customers if I cease to be a WIN Distributor.
10. RESIGNATION RETURNS - WIN DOES NOT REPURCHASE PRODUCT, EXCEPT IN ACCORDANCE WITH APPLICABLE STATE LAWS.
11. I understand that I have no power of authority to incur any debt, obligation or liability on behalf of WIN in any manner or for any purpose.
12. I understand and agree that I will not be treated as an employee with respect to my services for WIN as a WIN Distributor for federal or state tax purposes, including, but not limited to, the Federal Insurance Contributions Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding at source or for any federal, state or local tax laws. It is my responsibility and I agree to pay self-employment, local, state and federal income taxes as required by law.
13. I understand and agree that all orders submitted to WIN shall be accompanied by money order, cashier's check, a copy of a bank's verification of wire transfer, personal check or credit card information for the full amount due. I understand that all orders are subject to acceptance by WIN and the terms of this Agreement and the WIN Rules & Regulations.
14. I will not use the WIN trade name, logo, copyrighted materials, trademarks or service marks except in material provided by WIN. I understand that unauthorized use or duplication of WIN trademarks, trade names or copyrighted materials is a violation of federal law, as well as WIN Rules & Regulations. Upon termination of this Agreement, for any cause or reason, I agree to immediately discontinue using all trade names, trademarks, service marks, printed literature, sales aids and film or video sales presentations heretofore provided me by the Company and understand and agree that any violation of this clause will render me liable to the Company for infringement of its trade names, trademarks, service marks, copyrights and trade materials.
15. I agree to ensure that any prospective Distributor sponsored or dual sponsored by me receives the WIN Rules & Regulations and the WIN Compensation Plan prior to submission of the Associate Application and Agreement and I understand that I am responsible for training and supporting the Distributor(s) I sponsor into WIN.
16. I understand, represent and warrant that the ownership of my WIN distributorship complies in all respects to WIN Rules & Regulations.
17. I understand that I cannot sell my WIN distributorship except under restrictions contained in the WIN Rules & Regulations.
18. Corporations, partnerships, and/or trusts may be signed as Distributors of WIN ONLY if they meet the terms and conditions of the WIN Rules & Regulations.
19. ANY DISPUTE OR CLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR WITH RESPECT TO THE BUSINESS RELATIONSHIP ESTABLISHED BY THIS AGREEMENT SHALL BE RESOLVED BY EITHER BINDING ARBITRATION CONDUCTED IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, OR BY A COURT OF COMPETENT JURISDICTION. ALL AS SET FORTH IN THE WIN RULES & REGULATIONS. ANY SUCH ARBITRATION OR LITIGATION IN A COURT OF COMPETENT JURISDICTION SHALL BE PROPER ON/BEFORE AN ARBITRATION PANEL CONVEYED, OR IN A STATE OR FEDERAL COURT PRESIDING, IN DALLAS, DALLAS COUNTY, TEXAS. IT BEING AGREED AND UNDERSTOOD BY EACH DISTRIBUTOR THAT THEY IRREVOCABLY AND UNCONDITIONALLY SUBMIT THEMSELVES AND THEIR PROPERTY TO THE NON-EXCLUSIVE JURISDICTION OF ANY ARBITRATION, PANEL CONVENED, OR COURT OF COMPETENT JURISDICTION IN, DALLAS, DALLAS COUNTY, TEXAS, WHICHEVER IS APPLICABLE. THIS AGREEMENT, AS WELL AS THE WIN RULES & REGULATIONS, SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, UNITED STATES OF AMERICA, WITHOUT REGARD TO PROVISIONS GOVERNING CONFLICTS OF LAW.
20. I agree that WIN may use my name, likeness, voice, biographical information and the materials supplied by me for purpose of advertising, publicity and sales promotion; this will not violate the rights of any person or organization and will not incur any liability for payment to any person or organization.
21. I UNDERSTAND THAT I MAY APPLY TO BECOME A DUAL SPONSORED DISTRIBUTOR ONLY IF THIS AGREEMENT IS ACCOMPANIED BY A COMPLETED DUAL SPONSORING AGREEMENT. I ALSO UNDERSTAND THAT I WILL BECOME A DUAL SPONSORED DISTRIBUTOR WHEN I HAVE ATTAINED THE EFFECTIVE RANK OF MANAGER OR ABOVE IN THE WIN COMPENSATION PLAN.
22. COUNTERPARTS. THIS AGREEMENT MAY BE EXECUTED IN ONE OR MORE COUNTERPARTS, ALL OF WHICH SHALL BE CONSIDERED ONE AND THE SAME AGREEMENT AND SHALL BECOME EFFECTIVE WHEN ONE OR MORE COUNTERPARTS HAVE BEEN SIGNED BY EACH OF THE PARTIES.

**Optional in some states.

A PARTICIPANT IN THIS MULTI-LEVEL MARKETING PLAN HAS THE RIGHT TO CANCEL AT ANY TIME, REGARDLESS OF REASON. NOTARIZED CANCELLATION MUST BE SUBMITTED IN WRITING TO WIN AT ITS PRINCIPAL PLACE OF BUSINESS.


80000 SERIES
30% P C W

# WIN Today

INTERNATIONAL

Fourth Quarter 1996



*Seeing the World With WIN*

4

lenge," admits Billi, who concedes that—as newlyweds—she and Marty set a long-term goal of one day working together. "I love speaking and consulting, but I really wanted to fulfill our dream … Marty would occasionally reassure me that it would happen, that it just wasn't the right time. He was right!"

Looking back, the Lees admit that they never even considered multi-level marketing as an avenue to achieve this goal. As an international keynote speaker and columnist, Billi was unsurprisingly approached by countless network marketing companies … efforts, she admits, that were abruptly thrown by the wayside. "I never met people doing MLM that were the kind of people that I would naturally be inclined to hang out with or that were making it a real business," she explains. "I was used to thinking MLM was not very professional."

Suffice it to say, when longtime friend and WIN Regent Kat Jorstad invited Billi to an opportunity meeting in 1996, the renowned communicator was "looking for something to critique." She adds, "I only agreed to come to save [Kat] from making a bad business decision." Instead, she and Marty embraced the opportunity, and reached Regent status in the following weeks!

"I needed to see the credibility of the leadership," smiles a once cautiously optimistic Billi of her desire to attend an MLM College later that month. "What struck my husband and I during the first school was that [Ralph and Cathy] are brilliant people … we would like to go where they are going. I like their values, I like their energy and I like their commitment to excellence." Still attending MLM Colleges whenever possible, Billi adds that "seeing the people I met two years ago succeeding" has become one of the most exciting aspects of the schools.

Now transitioning to full time WIN, the mother of 17-year-old Vanessa has already cut back her speaking engagements, adding that she and Marty hope to become part of the President's Leadership Council before the year 2000. As for their long-term goals, Billi confidently states a desire to take the WIN opportunity into Russia. "The Russian people I know are worthy and deserving of a great opportunity. I've got people in place that would like to do business." Contemplating the vast potential of the Wellness business, she adds, "It's exciting to think you can *truly* build a worldwide organization."

The couple also sees WIN as their vehicle to establishing a foundation for single mothers. "The Haven" was conceived as a way to honor the lives of Billi and Marty's mothers—both widowed young and left to raise children alone. "Single moms never catch a break," says Billi, a former Peace Corps volunteer who once took a break of her own by spending a day with the Dalai Lama. "I'd like to have a great big ranch in northern New Mexico where the women could lay in the sun or take courses and their children would be taken care of. That's our dream."

And while opening their training center will be the first of many milestones Billi and Marty Lee are sure to reach while growing their business, they are obviously right on course … and steering by the light of their dreams.

# Top Producers

*Based on Personal/Group Retail Sales Volume*

## August '98

| | |
|---|---|
| 1. Robert and Eunice Lange | $330,549 |
| 2. KC and Ra Chetty | $312,282 |
| 3. Moshe Dekel | $210,822 |
| 4. Laura Haberstroh | $180,010 |
| 5. Bruce and Barbara Sindler | $146,323 |
| 6. Gary and Rosi Markewich | $135,176 |
| 7. Lawrence Wong | $135,101 |
| 8. Larry and Toya Siegel | $116,242 |
| 9. Michael and Jodi Sherman | $81,421 |
| 10. Marc and Lynette Braunstein | $64,516 |

## September '98

| | |
|---|---|
| 1. Theodore and Parvin Jacobs | $606,907 |
| 2. Tom Cunliam | $330,044 |
| 3. Lance and Roxanne Shoen | $330,044 |
| 4. Shahrokh and Nahid Ahkami | $327,003 |
| 5. Oscar and Elise Morales | $178,588 |
| 6. Marty Rising | $150,130 |
| 7. Gilbert and Nina Head | $150,050 |
| 8. Heather Plank | $150,000 |
| 9. Tom and Sydney Pernice | $145,968 |
| 10. David and Ingrid Huffine | $144,080 |

## October '98

| | |
|---|---|
| 1. Daniel Spethmann and Susan Stoltzman | $330,075 |
| 2. Michael Alexander and Carmen Printup | $330,005 |
| 3. Kent Nelson | $327,425 |
| 4. Clifford and Janice Dubbin | $315,615 |
| 5. Susan Watling | $256,776 |
| 6. Frank and Marlene Whitehead | $182,171 |
| 7. Jessie and Shrinder Singh | $177,307 |
| 8. Brent and Robin Chestnut | $176,790 |
| 9. Peter and Diane James | $176,354 |
| 10. John and Terry Osterkamp | $161,868 |

*The earnings of distributors mentioned in this publication are not representative of what you can earn, or of what a given Wellness International Network, Ltd., distributor can earn. Your earnings and recruitment experiences as a Wellness International Network, Ltd., distributor are strictly dependent upon your individual effort and enterprise*



WIN Today

Volume VIII

New Beginnings

EXHIBIT
5
PENGAD-Bayonne, N.J.

> *In the beginning,
> I didn't believe we could reach
> what we've reached now."*

quite convinced. "Fantastic story." In November, their sales dramatically. Their attitude quickly changed, however, and today, when Ron Grounbers skepticism is can understand, when it's coming from. "In the beginning, I didn't believe we could reach what we've reached now," he admits. "And now I understand."

Since January 1999, their Double Diamond have paid out monthly earnings as high as $22,000 and Personal Group volume of more than $300,000. With a more-than-a-year-and-a-half in the business, Double was able to pay one-third of the construction of an oceanfront resort for her business in Jesus so that she could work their With a full time. According to Double, the success of a couple is owing to many who are extremely honest, hardworking and frank about their sales and dedication.

Now the Waanders are leading by and example, filling the role of upline as support to work, Just this month, these two are taking their financially secure work with them on their trip to Switzerland to engage their first-ever "Achievers Summit." Meanwhile, holds forth on as a hopeful entrepreneurs.

"In fact," he says, recently celebrated another major business milestone with the future with their newly grown children Irene, Bono (22) and daughter Maddie (17). "We are planning a future. Our business is on to join us. "We're the next step in the process."

# **Top**Newcomers



| November '99 | December '99 | January '00 |
|---|---|---|
| 1. Abaid & Shaheen Rashid | 1. Dr. Edward Lundquist | 1. Lynne & Robert Brull |
| 2. Naila Haroon | 2. Pratima Muzumdar | 2. Piet & Dina de Reuver |
| 3. Carol & George Norton | 3. Charles Thomas | 3. Bram & Jasper Kal |
| 4. Chad Danielson | 4. Bram Lustyg | 4. Carolina (Rolanda) |
| 5. Rox Ann & Lance Fillmore | 5. Helene Eveleens & Ed Van Leeuwen | 5. Ali & Abida Mustafa |

*Based on Personal Group Retail Sales Volume in their Qualifying Month*

# WIN Today

Fourth Quarter 2000

Volume VIII

# A Dutch Sensation

## Paul & Els Gebbink

PENGAD-Bayonne, N.J.

EXHIBIT

6



## Monthly Top Producers

| | |
|---|---|
| September 1999: | Shahrokh & Nahid Ahkami |
| October 1999: | Kamal & Lisa Haddad |
| November 1999: | Tassos & Mary Ann Nassos |
| December 1999: | John & Joan Smith |
| January 2000: | Nicholas Neumann |
| February 2000: | Glenn Hurst |
| March 2000: | Mohammad & Firdous Sharif |
| April 2000: | Rajendra & Vina Patel |
| May 2000: | Niranjan Patel |
| June 2000: | Waqar Khan |
| July 2000: | Anil & Louise Garde |
| August 2000: | Philip & Sajini Goduco |







## April 2001

Don't miss out on another exciting opportunity to celebrate in style! The April National Meeting set for April 19-21 at the Marriot Crowne promises to be an incredible event featuring inspirational testimonials, spectacular training, and fellowships with WIN contributors worldwide. We'll top the weekend off with entertainment provided by Professor DJ, so put on your dancing shoes and get ready for an unforgettable experience!

day

NOTES

# Five Step Program

**Step 1.    USE THE PRODUCTS.**

Talk to people, listen to their results, get on the Internet, use WIN Access™, go to meetings and read the *WIN Today* magazine. Take advantage of every opportunity to speak or hear from others who are using our products! Start using the products and experience results for yourself.

**Step 2.    SHARE THE BENEFITS OF THE PRODUCTS.**

Always share the benefits of the products with everyone you come in contact with. Share what products you're using, how you're using them and the results you're having. Tell them success stories of other people who are using the products. You'll find that people get excited about the success that you and others are having with the WIN products.

**Step 3.    SHARE THE PRODUCTS.**

How many times have you heard people say they're:

- ❏ *stressed out*
- ❏ *have no energy*
- ❏ *not motivated*
- ❏ *wake up tired*
- ❏ *feel lethargic*

- ❏ *overweight*
- ❏ *sick of diets*
- ❏ *reached plateau in exercise program*
- ❏ *need to save money*
- ❏ *need to earn money*

When you talk to people, match the products to the person.

◆ *overweight person*    *"I've lost _____ pounds. These products are great!"  "Use these samples the next few days. I know you'll be just as excited as I am!"*

◆ *tired, lethargic person*    *"I used to just drag around all the time. Now I feel great!"  "Here, drink this, you'll see what I'm talking about. I just love these products!"*

**Step 4.    SHARE THE OPPORTUNITY TO PURCHASE PRODUCTS AT RETAIL OR WHOLESALE.**

After you have shared products, and they are absolutely sold on

EXHIBIT
7

the products, what's the next question they ask?  "How much does it cost?"  *"Well, Tom and Mary, it depends.  Do you want to purchase at retail or wholesale?  The reason why I am saying this is because there's an opportunity here for you to purchase these products at an immediate discount if you are interested."*  Well, what do you think they are going to say ... *"No, John.  I like to pay full price for everything."*?  You know that they are not going to say that.  They will say, *"Sure, tell me all about it."*  Just what you're waiting to hear, right?

### Step 5.  *SHARE THE OPPORTUNITY.*

Just relax and have fun.  These need not be formal presentations (although they may be).  Each may be as informal as telling someone about the opportunity at lunch one day or even around your kitchen table; or an invitation to join in on a three-way call.  Or it may be as formal as taking someone to dinner or a business seminar.  Just tell them about the WIN opportunity!

# *Product Tracking Forms*

WIN Product Tracking Form have been specifically designed for you to follow up with your target market.  These sheets provide a record keeping system.  A system for you to keep up with follow-up information such as when:

1)  sample product was handed out,
2)  additional marketing information was given,
3)  prospect came to an opportunity meeting, etc.

© 1993-1998 Wellness International Network, Ltd.

rev. 12/14/98





WIN Today

New Beginnings

EXHIBIT

8

PENGAD-Bayonne, N.J.





**❝ I had a career and lifestyle most people would envy and few could enjoy ... a complete success by all standards. Except my own.❞**





*Kamal and Lisa Haddad now enjoy more time with their kids— Chris (13), Matt (11) and Missy (9) because of their WIN opportunity.*



# the American Dream

Having always dreamed of a better life for his family, Chicago resident Kamal Haddad has worked hard to achieve the "American Dream." Jordanian by birth, Kamal moved to America as a child in 1969 and has since accomplished great feats in both his personal and professional lives.

A DePaul University graduate and CPA, Kamal spent the early years of his career with a Big 8 accounting firm, and eventually went on to start his own accounting and management consulting business. "I've been fortunate throughout my life," he admits. "I've seen and experienced numerous types of business opportunities."

From electronic security, international trading, and contract negotiations, to due diligence reviews, diplomatic relations, and compliance and regulatory audits, a well-rounded Kamal has certainly excelled in his field. He spent two years in Russia working to create a stable economic infrastructure, while also helping to get their natural resources moving in the world market ... a task which helped earn him the formal distinction by the Illinois Department of Commerce and the International Agency for Rural Industrialization, a delegate agency to the United Nations, as a

"hands-on" expert on conducting business in the former Soviet Union.

"I had a career and lifestyle most people would envy and few could enjoy ... a complete success by all standards," admits Kamal. "Except my own."

According to the proud father of three, it was a bitter dose of reality which opened his eyes—and those of his wife, Lisa—to the possibity of another opportunity. "I knew that, if something happened to me, my family couldn't maintain the lifestyle I had worked so hard to achieve," he says.

Even so, Kamal never thought for a second that the answer would come in the form of multi-level marketing. In fact, he laughed at his friend, PEC member Michael Jareou—when Michael told him he had joined WIN. "I was going to show him that this company doesn't work, and this concept doesn't work," says Kamal with a grin, recalling his initial reason for accompanying Michael to Dallas.

Now nearly two years later, Kamal is applying the same drive and determination that catapulted him to success in his previous profession to his WIN business. He has since become a familiar face among the company's monthly Top Producers, achieved earnings in excess of

$45,000 in a single month, and now aspires to earn half a million dollars by the end of the year. And with 11 people in his downline already qualified for the Cruise 2000, Kamal estimates his organizational sales volume to be nearing $4 million. "I feel secure with the power of residual income and the continuing growth of my organization," explains Kamal, who understands that geometric progression is a powerful force in network marketing. "We didn't get the hundreds; we got a *couple* who went out and got a *couple* who went out and got a *couple*. Now we have *hundreds*."

For the Haddad family, WIN has been a dream come true. Now with more time together than ever before, they say their lives and experiences are richer because they now have the time to enjoy every moment. Kamal is especially pleased to have the time to devote to his children's extracurricular activities—sometimes as the coach! From the boys' baseball and wrestling events to his daughter's tap dancing recitals, Kamal has achieved a new kind of wealth that not even money can buy.

And for someone who has long since achieved financial freedom, these are the "treasures" that are truly *priceless*.

RECYCLED ♻

80000 SERIES
30% P C W

# Hypothetical Business Plan

By using geometric progression for demonstration purposes.

|          | **You** | introduce five referrals |
|----------|---------|--------------------------|
| **Year 1** | 5     | who introduce five others |
| **Year 2** | 25    | who introduce five others |
| **Year 3** | 125   | (WIN pays down six levels*) |
|          | 155     |                          |

|              |                                        |
|--------------|----------------------------------------|
| **155**      | Referrals in your network              |
| x $2,000     | per month (29 BioLean/office)          |
| $310,000     | Total Retail Business in Your Network  |
| x   0.65     | Wholesale dollar                       |
| $201,500     | Total Wholesale Business in Network    |
| x    4%      | Residuals You Earn from the Network    |
| $8,060/month |                                        |

**At 10% earnings would be $20,000/month.**
**At 18% earnings would be $36,000/month.**

*Profit is approximate and is maximum possible at each level. See WIN's complete
compensation plan for details. This example is for educational purposes only
*The above example uses 3 years to build a business. On Long Island the numbers used
were reached in the first year. Independent Marketing Associate.*

EXHIBIT
9





EXHIBIT
10

# Rules and Regulations

As a Independent Distributor (hereinafter "distributor") of Wellness International Network, Ltd. ("WIN"), you are required to understand and comply with all rules, regulations, policies and procedures set forth in your distributor manual (*the WIN System for Success*) or that may be published by WIN (hereinafter, the "Rules & Regulations"). WIN reserves the right to amend these Rules & Regulations by publishing amendments in writing as it deems appropriate in official WIN literature.

WIN honors all international, federal, state and local regulations governing network marketing and require every distributor to do the same. To the extent anything herein is inconsistent with any applicable law, such applicable law shall govern. It is, therefore, very important that you read the information in this section.

Review the Professional Ethics and the Rules & Regulations often. Make them a part of your planning. Remember: There are many opportunities in WIN, but only one WIN opportunity; and that opportunity is available ONLY to those who maintain the high standards of professionalism and ethical conduct required to win with WIN.

# A. PROFESSIONAL ETHICS

*As a distributor of Wellness International Network, I hereby promise and agree that:*

- I will be honest and fair in all my dealings while acting as a distributor of WIN.
- I will respect the time and privacy of the people I contact to become retail customers or distributors of WIN. I will be courteous and respectful to every person contacted in the course of my WIN business.
- I will perform all my professional activities in a manner that will enhance my reputation and the reputation of WIN.
- I will fulfill my leadership responsibilities as a sponsor, including training and otherwise supporting distributors in my sales organization.
- I will not engage in any deceptive or illegal practice.
- I will not make diagnostic, therapeutic or curative claims for WIN nutritional products, nor will I make any claims not contained in official company literature. I will represent only that "each body is unique and responds uniquely to nutritional supplementation," remembering that even my personal experience of nutritional benefits may be interpreted as an "extension of labeling claims" if I use those experiences as a sales device.
- I will make no income claims or representations, remembering that ideal projections of the WIN Compensation Plan are unrealistic. No network grows in a perfect geometric progression, and it is therefore impossible to predict incomes. Further, a WIN distributor's success depends on many variables, such as amount of time committed to his/her business, organizational ability, etc., and therefore, earnings are not guaranteed.
- I understand and agree that I am solely responsible for all financial and/or legal obligations incurred by me in the course of my business as a distributor of WIN products and/or services, including self-employment taxes, income taxes, sales taxes, license fees, etc.
- I understand and agree that American capitalism is one of the most competitive economic systems in the world; I will compete aggressively but fairly, and I will respect the professionals of other network marketing companies. I will not solicit from the proprietary rolls or "genealogical" printouts of other network marketing companies. I will not use sales materials or professional associations that may be regarded as proprietary by other companies. WIN seeks to promote the reputation of all reputable network marketing companies that

are furthering the cause of personal independence for their distributors.
- I will make every effort to assure the adequate training of distributors they sponsor. "Adequate training" shall include (but not be limited to) education regarding the WIN Rules & Regulations, Compensation Plan, product information, sound business practices, sales strategies and ethical behavior.
- I will make every effort to maintain an ongoing, professional, leadership association with distributors in my organization for the purposes of communicating, training and motivating.

# B. DISTRIBUTOR STATUS
### (Independent Distributor)

**B-1**   **Becoming a Distributor.**  An applicant becomes a distributor of WIN when both of the following requirements are completed:

1) The applicant purchases, at cost, a *WIN System for Success*\* (which includes the *WIN System for Success* binder, "Power of Goal Setting" audio tape, sample forms and brochures, four quarterly issues of the *WIN Today* magazine and four issues of *WINner's Update* quarterly newsletter) which are sales materials (not for resale); and

2) The applicant executes an Distributor Application and Agreement Form ("Distributor Agreement"), and the Distributor Agreement is accepted by WIN.

New Associates may buy products at wholesale from their sponsors or the company IMMEDIATELY upon final application processing by WIN.

WIN reserves the right to decline any Distributor Agreement.

The Distributor Agreement incorporates, by reference for all purposes, the Rules & Regulations. Therefore, unless otherwise expressly stated to the contrary herein, all references to the Rules & Regulations shall also refer to the terms and conditions of the Distributor Agreement and vice versa.

\*Optional in North Dakota

**B-2**   **No Purchase Required.**  No person is required to purchase any WIN product or service.  The only purchase required of new distributors is the purchase of a *WIN System for Success* (optional in the state of North Dakota).  The *System for Success* is sold at cost to support the success of each new distributor with sales and organizational tools, communication and training.

**B-3**   **Distributor Rights.**  Subject to compliance with their obligations under these Rules & Regulations, all distributors have the rights afforded hereunder, including the right to purchase and resell WIN products, participate in the WIN Compensation Plan, and to sponsor new distributors into the Compensation Plan; provided, however, that some or all of the rights as a distributor are subject to forfeiture or termination by WIN for failure to comply with all of these Rules & Regulations.

**B-4**   **Legal Age.**  Distributors must be of legal age in the state or country of their residence.

**B-5**   **Married Couples.**  Married couples who are married at the time they become distributors must share a single distributorship entity. Distributors who marry after they are already distributors may maintain separate distributorships; provided, however, that in the event that such distributors elect to maintain separate distributorships, they will not be afforded the benefits which would accrue if the distributorships were combined; provided, however, that under no circumstances shall a married couple have an interest, financial or otherwise, in more than three distributorship entities.  When a couple sharing a distributorship entity divorces or separates, WIN will continue to pay commission earnings as before the divorce or separation until it receives a notarized written notice, signed by both parties or by a certified court decree or order, specifying how future commission earnings should be paid.  Nothing herein shall prohibit WIN from interpleading any commission earnings into the registry of a court of competent jurisdiction in the event WIN believes a dispute exists as to payment of commission earnings

and it perceives that it is in jeopardy of being responsible for the payment of more commission earnings than are owed.

Upon a divorce, subject to a divorce decree or court order, a divorced spouse has the option to commence a distributor distributorship in a first generation position directly under his/her sponsor beginning with the effective date of the divorce. If such option is elected, such spouse is not subject to the six (6) month waiting period requirement outlined in **Rule C-6 Voluntary Resignation.**

**B-6**    **Simultaneous Interests.**  Distributors and/or their spouses may not have simultaneous beneficial interests in more than one distributorship entity until they are permitted to commence a second distributorship, according to the then existing WIN Compensation Plan.

At WIN's sole discretion, a higher rank and effective date may be granted.

**B-7**    **Corporations, Partnerships and Trusts.**  Corporations, partnerships (general or limited), limited liability companies and/or trusts may be signed as distributors of WIN ONLY when an Distributor Agreement is executed by an authorized individual and forwarded to WIN, along with:

1) Articles of incorporation, partnership agreement, operating agreement or trust documents.
2) A complete list of all directors, officers and shareholders involved in the corporation, pursuant to **Rule B-6 Simultaneous Interests.** Partnerships must disclose all general and limited partners. Limited liability companies must identify all members and or managers.
3) Proof of a Federal ID number (no filing receipts accepted) or a copy of the Annual Certification from the Secretary of State or the State of Partnership Registration or Incorporation.
4) A notarized copy of the Corporation, Partnership, Trust, DBA form.
5) Any other documentation reasonably required by WIN.

A distributor may change an existing distributorship to a corporation, partnership (general or limited), limited liability company or trust by submitting to WIN a notarized Information Change Notice, pursuant to **Rule B-20 Account Information Changes,** accompanied by copies of the documents listed above in items 1 through 5. All documents must reflect the same name(s) and address that is on record with WIN. Pursuant to **Rule D-1 Trademarks,** distributors may not use the name Wellness International Network, Ltd., or any combination of the name thereof, when identifying their corporations, partnerships, limited liability companies or trusts.

Should there be a change in the directors, officers, shareholders, members, managers, trustees, executives or partners of any given corporation, partnership, trust or limited liability company, WIN will continue to pay commission earnings as before the change until it receives a notarized written notice, signed by all parties, or by a certified court decree or order, specifying how future commission earnings should be paid. Nothing herein shall prohibit WIN from interpleading any commission earnings into the registry of a court of competent jurisdiction in the event WIN believes a dispute exists as to payment of commission earnings and it perceives that it is in jeopardy of being for the payment of more commission earnings than are owed.

No distributor may have a beneficial or financial interest in any distributorship entity in which they or their spouse serve or hold a position as an officer, director, shareholder, partner, member, manager, trustee or executor; provided, however, this prohibition shall not apply to any officer, director, member, manager, trustee or executor who does not receive and is not eligible for any financial compensation in such capacity and verifies such fact through documentation reasonably satisfactory to WIN.

**B-8**    **Assumed Names.**  A person or entity may apply as an Independent Distributor using an assumed name only after completing WIN's DBA form accompanied by the appropriate documents. Pursuant to **Rule D-1 Trademarks,** distributors may not use the name Wellness International Network, Ltd., or any combination of the name thereof, when identifying their distributorships and/or training centers.

**B-9**    **Annual Renewal.**  Distributors must renew their distributor status annually. The annual renewal

notice and fee is due on the anniversary month of the distributor's enrollment date. A Renewal Notice will be mailed just prior to the distributor's anniversary month, which requires the careful review and execution by each member of the distributorship. Renewal Notices must be returned to WIN before the last day of their anniversary month. Any distributor not renewing by the last day of their anniversary month shall be deemed to have voluntarily terminated their distributor status relationship with WIN, and thereby forfeited all rights as a WIN distributor, including without limitation, sponsorship rights, positions earned and any applicable compensation as provided in Subsection C herein and the WIN Compensation Plan.

At WIN's sole discretion, the distributor's previous rank may be reinstated.

**B-10**    **Independent Contractor Status.** All distributors are independent contractors. They are not franchisees, joint ventures, partners, employees, representatives or agents of WIN. Distributors are strictly prohibited from stating or implying, whether orally or in writing, that they are franchisees, joint ventures, partners, employees, representatives or agents of WIN. Except as otherwise expressly provided herein, WIN may not control or in any other way execute dominion or control over a distributor's business. Distributors are prohibited from soliciting communication, whether orally or in writing, to WIN's corporate vendors, product developers and former staff members. Distributors have no authority to assume, create or bind WIN to any obligation, nor shall any distributor issue or cause to be issued any statements, writings or documents under the name of WIN, but rather shall use their own name for such purposes.

**B-11**    **Indemnity Agreement and Attorneys Fees.** Each and every WIN distributor agrees to indemnify and hold harmless WIN, its officers, agents and directors against any claim, demand, liability, loss, cost or expense including, but not limited to, attorney's fees, arising or alleged to rise, in connection with that distributor's WIN business or that distributor's activities as a WIN distributor. In addition to, but without waiving the foregoing, if WIN incurs attorneys fees in order to enforce any of the terms of the Distributor Agreement including these Rules & Regulations due to a distributor's failure to abide by the terms of the Distributor Agreement (including these Rules & Regulations) or is in default thereunder, then in such event, such distributor agrees to reimburse to WIN its reasonable attorney's fees, costs, and disbursements incurred. The reimbursement of the fees, costs and conditioned disbursements shall not be collected upon the commencement of litigation. If litigation is commenced, to the extent WIN is prevailing party, it will be entitled to reimbursement from the distributor of its reasonable attorneys' fees, costs and disbursements incurred, including fees, costs and disbursements incurred in any and all post-trial matters and appeals therefrom. WIN reserves the right to debit directly the distributor's commission and bonus account for all legal fees and costs incurred by WIN.

**B-12**    **WIN Access™ and Office2office℠.** All distributors are automatically enrolled in WIN Access™, WIN's touch-tone telecommunications system, and Office2office℠, an online interoffice web site for distributors. WIN Access™ users can receive corporate broadcasts, check volume status information, send and receive messages, place orders, promote Distributors, check meeting schedules and listen to training seminars 24 hours a day, seven days a week. Office2office℠ users can enroll new Distributors, check volume status information, monitor organizational statistics, place and track orders, send and receive e-mail messages, view online training presentations and download current forms at any time, day or night. WIN Access™ and Office2office℠ fees are calculated by the following method:

- U.S. Managers and above who earn commissions in excess of $400 will be charged 2.5% of the amount earned, with a minimum of $60 and a maximum of $250. Associates, as well as Managers and above who earn commissions less than $400, will not be charged WIN Access™ or Office2office℠ fees.
- Non-U.S. Managers and above who earn commissions in excess of $200 will be charged 1% of the amount earned, with a minimum of $20 and a maximum of $100. Associates, as well as Managers and above who earn commissions less than $200, will not be charged WIN Access™ or Office2office℠ fees.

All distributors who request a Genealogy Report via WIN Access™ will be charged a minimum of $5 per fax, plus 4 cents per line. There is no charge for reports generated via Office2office℠.

**B-13**   **Taxation.** It is acknowledged that WIN distributors are only independent contractors, entitling them to resell products that they purchase from time to time from WIN. As distributors, they will be treated as self-employed and not as employees of WIN for federal, state and local tax purposes. They will be required to file all returns and reports required by state, federal or any governmental taxing authorities, including (if necessary) declarations of estimated income tax, sales tax returns and income tax returns, and to pay all governmental, federal, state and local taxes arising from activities as WIN distributors, including income, sales, use, service, occupation, excise, gross receipts, property and self-employment taxes.

**B-14**   **Legal Compliance.** All distributors shall comply with all federal and state statutes and regulations and local ordinances and regulations concerning the operation of their business. Similarly, distributors doing business in foreign jurisdictions in which WIN's products and opportunity are lawful and proper, are required to comply, in all respects, with the laws of such foreign country. All distributors are responsible for their own managerial decisions and expenditures, including all established income and self-employment taxes. At the end of each calendar year, WIN will issue an IRS Form 1099 for distributors as required by law. (At the time of this printing, the law requires 1099s only for incomes above $600 or for product purchases for resale in excess of $5,000 per year.)

**B-15**   **WIN Identification Number.** All distributors are required by federal law to obtain a Social Security number or Federal I.D. number, and WIN will use this number in all distributor transactions. However, a distributor may request to be issued their own PERSONAL D.I.N. (distributorship Identification Number) by completing a SSN/FID Privacy Request form and returning it to WIN. Upon receipt, the distributor will be informed in writing of their new PERSONAL D.I.N. The distributor will use this number in all future transactions with WIN. Distributors doing business in foreign jurisdictions, in which WIN's products are lawful and proper, are required to comply, in all respects, with the laws of such foreign country.

**B-16**   **No Exclusive Territories.** There are no exclusive territories (or any exclusive rights with respect thereto) for marketing or recruiting purposes, nor shall any distributor imply or state that he or she does have an exclusive territory or any exclusive rights whatsoever. There are no geographical or market limitations on resale of product or sponsoring of other distributors irrespective of whether such actions compete with another distributor's market and/or selling of WIN's products and opportunity.

Subject to compliance with these Rules & Regulations, any distributor shall have the right to open a training center or other business establishment for the purpose of training distributor's and potential distributors in the WIN business opportunity, and the responsibility for all training conducted at such establishments shall be vested solely in and with the distributor(s). There shall be no geographical prohibitions imposed upon the opening and maintenance of such establishments, irrespective of the location of existing (and potentially competitive) establishments.

**B-17**   **Other Products.** Except as provided in **B-19 Covenant Not to Compete**, distributors are not prohibited from selling or promoting the products or services of any companies (including other network companies) to WIN distributors so long as such selling or promotion is strictly limited to distributors in one's personally sponsored first generation (in the primary line). Notwithstanding the foregoing, no distributor shall have the right to use WIN-sponsored mediums, electronic or otherwise, for the sale or promotion of such products.

**B-18**   **Cross Group Buying/Selling.** So as to receive credit for Royalties, Bonuses and advancement, distributors are prohibited from engaging in cross group buying/selling. Only distributors at the Associate level may obtain all of their WIN products, literature and materials from or through their own primary Sponsor or first Primary Upline Manager when not making purchases directly from WIN.

**B-19**   **Covenant Not to Compete.** Distributors who obtain the level of Regent or above, as a material condition to attaining such levels, will neither directly nor indirectly, personally nor through any relationship or business entity, compete in any manner with WIN in any trade area in which they have an active downline, while in such capacity or for a period of one year from the date of termination with WIN.

WIN may enforce this provision in law or equity by seeking injunctive relief and damages. As used herein, the term "Compete" shall mean and include (a) the solicitation of distributors and potential distributors to other network marketing companies, and (b) the promotion, sale or offer for sale of any goods, products, services or business opportunities which in WIN's opinion competes with WIN's products, services and/or business opportunity.

**B-20**   **Account Information Changes.**  Distributors may update their distributor records by submitting original, notarized copies of the Information Change Notice for Independent Distributors to WIN. This form requires the signatures of all parties in the distributorship entity. A notary stamp is not required for changes made to a shipping address.

**B-21**   **WIN Compensation Plan.**  At WIN's sole discretion, the WIN Compensation Plan maybe amended from time to time and is incorporated into these Rules & Regulations by reference for all purposes.

# C. SPONSORSHIP & TRAINING; WIN's REMEDIES; TERMS OF TERMINATION

**C-1a**   **Sponsoring.**  WIN distributors are entitled to sponsor other distributors who reside in the United States or in foreign jurisdictions in which WIN's products and opportunity have been approved (see WIN official literature for lists of approved countries). However, distributors are compensated only for the generation of sales volume, *not* for sponsoring new distributors into the program.

**C-1b**   **Dual Sponsoring.**  WIN distributors are entitled to dual sponsor other distributors into the WIN program. A Dual Sponsored Applicant will become a Dual Sponsored distributor when:

1) WIN has received the Dual Sponsoring Agreement* within sixty (60) days of WIN's processing of the applicant's Distributor Agreement. After sixty (60) days, any modifications to the Agreement will be subject to the terms of **Rule C-4 Transferring Sponsorship; and**
2) The dual sponsored distributor has attained the effective rank of Manager or above.

*    *This Agreement, excluding the WIN UK Dual Sponsoring Agreement, may be executed in one or more counterparts, all of which shall be considered one and the same Agreement and shall become effective when one or more counterparts have been signed.*

All Royalties and Bonuses paid to the Primary and Secondary Lines will adhere to the following amendments to the WIN Compensation Plan:

1) Earnings are calculated entirely on the activity of the Primary Line;
2) Earnings are based entirely on the rank of the Primary Line;
3) For promotional and qualification purposes, all volume generated by a Dual Sponsored distributor is credited to the Primary Line. Royalties and Bonuses are paid only on qualified managerial tiers of the Primary and Secondary Lines. However, because certain monies are not split during the Dual Sponsored distributor's qualifying month, it is the Primary Sponsor's responsibility to share any applicable earnings with the Secondary Sponsor during the qualifying month;
4) ISD and Career Bonuses are exempt from the Dual Sponsoring Program;
5) The splitting of Royalties and Bonuses will occur only once and will be paid only to the applicable, qualified members of the Primary and Secondary Lines; and
6) Royalties and Bonuses paid to the various levels of the Primary and Secondary Lines will equal the amount earned by the Primary Line (as per the WIN Compensation Plan), multiplied by 98%, and divided by 2.

**C-2**   **Modifications to Original Terms.**  Except as provided in sub-sections 1 and 2 herein, if an applicant submits multiple Distributor Agreements and/or Dual Sponsoring Agreements listing multiple sponsors, only the first completed Agreement(s) to be received by WIN will be accepted, if any. However, modifications may be made to the terms of the accepted Agreement(s) according to the following:

1) New applicants are entitled to change sponsors within seven (7) days of WIN's processing of

their original Distributor Agreement only by submitting a New Associate Update to WIN. The New Associate Update, which must accompany an amended Associate Agreement and/or Dual Sponsoring Agreement, requires the notarized signatures of the following individuals:

- a) New Applicant/Co-Applicant
- b) Sponsor (Primary Sponsor)
- c) Secondary Sponsor (if Dual Sponsored)
- d) Fully Qualified Manager — Primary Upline
- e) Fully Qualified Manager — Secondary Upline (if Dual Sponsored)

After seven (7) days, any modifications to the Agreement will be subject to the terms of **Rule C-4 Transferring Sponsorship.**

2) Non-Dual Sponsored applicants are entitled to add a Secondary Sponsor within sixty (60) days of WIN's processing of their original Distributor Agreement given that a Dual Sponsoring Agreement is received. After sixty (60) days, any modifications to the Distributor Agreement will be subject to the terms of **Rule C-4 Transferring Sponsorship.**

**The processing date for Internet applicants is the date in which the Distributor Agreement is submitted online. In order for the modification to be processed, the original, computer-generated Distributor Agreement must be received by WIN. All modifications are effective the volume month in which they are processed. WIN reserves the right to be the final arbiter. Any decision of WIN is final.**

**C-3** *Intentionally omitted*

**C-4** **Transferring Sponsorship.** Except as provided in **Rule C-2 Modifications to Original Terms,** a distributor is strongly discouraged and seldom permitted to transfer to a different sponsor or sponsorship line. However, transfer requests may be made by submitting the following to WIN:

1) a revised Distributor Agreement;
2) a revised Dual Sponsoring Agreement (if applicable);
3) A Sponsor/Upline Change Request form, requiring the notarized signatures from the following individuals* on one original document, stating that they understand and consent to the requested transfer (*Proposed Upline members are thereby also stating that they are willing to assume all responsibility, including all commission liability, for the transferring distributor, both past and present):
   - a) Distributor Requesting Transfer
   - b) Current Primary Upline (6 levels)
   - c) Current Secondary Upline (6 levels)
   - d) Proposed Primary Upline (6 levels)
   - e) Proposed Secondary Upline, if applicable (6 levels); and
4) A $100 processing fee.

**All transfers of sponsorship require the final approval of WIN whose decision, if granted, will apply only to the distributor making the request and not his/her downline organization. If the transferring distributor wants his/her organization to transfer intact, then Downline Consent forms for each person in the downline must also be submitted to the upline along with the original Sponsor/Upline Change Request form.**

**C-5** **Acquisition of Business.** Any distributor desiring to acquire an interest in another distributor's business must first resign his/her distributor status and wait for six (6) months before becoming eligible for such a purchase or partnership agreement, and such transaction must comply in all respects with **Rule C-10 Limits on Transferability or Sale.**

**C-6** **Voluntary Resignation.** A distributor may voluntarily resign his/her distributor status by sending a NOTARIZED written notice to WIN that he/she is resigning his/her distributor status or by failing to renew timely their Distributor Agreement(s). Voluntary resignation is effective upon (a) the failure to renew timely one's distributor status, or (b) receipt of such notice by WIN. If the distributor voluntarily resigns with Personal/Group Volume before WIN performs the bonus run for the month in question, the

resigning distributor's volume will automatically roll up to the first Qualified Upline Manager and be included in his Personal/Group Volume for that month. WIN reserves the right to notify any persons or parties it deems appropriate of such termination. A distributor who VOLUNTARILY resigns his/her distributor status may reapply after waiting six (6) months from the date of resignation. A distributor who fails to renew his/her distributor status when renewal is required may not apply as a WIN distributor under a new sponsor until a six (6) month waiting period has elapsed.

In the event that a distributorship entity is made vacant by a terminating distributor who does not sell, assign, or otherwise transfer ownership of said distributorship in accordance with these Rules & Regulations, the distributorship entity in its entirety becomes the sole property of WIN.

C-7    **Violations and Liabilities.**  Except as expressly set forth below with respect to violations of sections B-17 and B-18, in the event that a distributor fails to abide by or comply with any of the terms, conditions or covenants (hereinafter, "Obligations") set forth in the Distributor Agreement and/or these Rules & Regulations, and such failure to abide by or comply with is not cured (if curable) within ten (10) days of written notice by WIN to such distributor, WIN, at its option, and without further demand or notice, shall have the following rights and remedies in addition to any rights provided by law or equity, all of which shall be cumulative:

(a)    suspend a distributor's distributorship(s) for a period not to exceed six (6) months, and such suspension shall mean, among other things, that such distributor may not have the right to represent him/herself as a distributor of WIN and shall forfeit during such suspension period any rights or interests afforded under these Rules & Regulations, including without limitation, the right to resell WIN products or sponsor other distributor's, to receive any compensation, commissions or their benefits associated with the activities of WIN distributor (collectively, "distributor Benefits");

(b)    terminate such distributor's distributorship(s), thereby precluding the right of such distributor to engage in business with WIN, either directly or indirectly and to be afforded or entitled to the distributor Benefits; and/or

(c)    exercise any rights afforded to WIN, at law or in equity, including without limitation, the initiation of litigation (in accordance with these Rules & Regulations) to recover its damages and costs associated with such distributor's failure to abide by or comply with the Obligations.

Notwithstanding anything to the contrary set forth herein above, in the event that a distributor fails to abide or comply with any of the terms, conditions or covenants set forth in sections B-17 and B-18, then WIN has the absolute right to, without further demand or notice or opportunity to cure, among other things, terminate such distributors distributorship(s) and preclude the right of such distributor to engage in business with WIN, either directly or indirectly, as well as exercise any rights afforded to WIN, at law or in equity, including without limitation, the initiation of litigation (in accordance with these Rules & Regulations) to recover its damages and costs associated with a distributor's failure to abide by or comply with the terms, conditions or covenants set forth in sections B-17 and B-18.

C-8    *Intentionally omitted*

C-9    *Intentionally omitted*

C-10    **Limits on Transferability or Sale.**  Due to the potential negative impact that a transfer of a distributor's business or distributorship may have on other distributors, WIN reserves the right, in its sole and absolute discretion, to not permit any such transfer that it believes will have such an effect. In the event WIN does agree to such a transfer, the following requirements must be satisfied. The proposed transfer must be completed and forwarded to WIN for review, with a $750 processing fee. The transaction must involve the sale of all of the transferor's rights, title and interest in WIN, including all of the transferor's interests, financial, beneficial or otherwise, in each and every distributorship in which transferor has any interest. Irrespective of the level attained by transferor, the transferee will not be

eligible for any ISD and Career bonuses by virtue of the transaction, but rather may be transferred a distributorship at a level no greater than Regent. All terms and conditions set out in **Rule C-4 Transferring Sponsorship** (except the processing fee contained therein) must be complied with.

After receiving the fee, WIN will give written notification if the transaction is approved.

C-11    **Succession.** Notwithstanding any other provision of this section, upon the death of a distributor, the distributorship entity shall pass to his/her successors in interest as provided by law. However, WIN will not recognize such a transfer until the successor in interest has submitted an informational Application and Agreement Form together with certified copies of the death certificate and will, trust or other instrument. The successor shall thereafter be entitled to all the assignment of all rights and shall assume all the obligations of the deceased (predecessor) distributor.

C-12    **Confidentiality Agreement.** Information contained in any genealogical or downline reports as well as any Internet e-mail broadcasts (including e-mail addresses) provided to a distributor by WIN is proprietary and confidential to the company and is transmitted to the distributor in confidence. The distributor agrees that he or she will not disclose any such information to any third party, directly or indirectly, or use the information to compete with WIN or for any purpose other than promoting WIN. The distributor and WIN agree that, but for this agreement of confidentiality and non-disclosure, WIN would not provide the information to the distributor.

C-13    **Solicitation Using Commission Earnings/Statements.** WIN does not permit the displaying or showcasing of commission earnings and/or commission statements for the purpose of recruiting potential distributors.

C-14    **Cross Group Recruiting.** Any effort to recruit a distributor already in WIN is prohibited.

C-15    **Registration of Michigan Cooperatives/Associations/Training Centers.** WIN maintains and enforces a policy, which regulates the establishment, registration, and operation of groups of associated participants, organized as cooperatives or otherwise linked. WIN's policy and practice shall prohibit participants from soliciting any person to join or become a member of the Michigan cooperative or association of participants without:

   1)    Disclosing any applicable terms, conditions, fees and costs involved with such membership;
   2)    Disclosing whether such cooperative or association is registered with WIN; and
   3)    Providing that person with a copy of WIN's guidelines for operation of registered cooperatives.

WIN shall revoke the registration of any Michigan cooperative not in compliance with WIN's policy and practices with respect to Michigan Cooperatives.

C-16    **International Sponsoring.** International sponsoring is permitted only in those countries which WIN is authorized to sell product and promote its opportunity, which presently includes Holland, Belgium and the United Kingdom. Distributors are eligible to sponsor distributors from those countries into the WIN program only upon submitting a completed agreement applicable for such approved country with the appropriate fee. Sponsoring of distributors to do business in non-approved countries is prohibited.

# D. TRADEMARKS, LITERATURE AND ADVERTISING

D-1    **Trademarks.** The name Wellness International Network, Ltd., WIN, the WIN logo and the names of all WIN products are the trademarks of WIN and/or have propriety rights afforded to WIN and, as such, no derivation or duplication of Wellness International Network or WIN shall be used in the course of a distributor's business. Only WIN is authorized to produce and market products and literature under these trademarks. Use of the WIN name on any item not produced by WIN is prohibited, except in the manner described below:

**John Jones**
**Independent Distributor of WIN**

**D-2**  *Intentionally omitted*

**D-3**  **"800" Telephone Number Listings.**  WIN distributors are permitted to list their "800" telephone numbers under the WIN trade name only if stated in the following manner:

**Jones, John**
**Independent WIN Distributor**

**D-4**  **Imprinted Checks.**  WIN distributors are not permitted to use the WIN trade name or any of its trademarks on their business or personal checking accounts. However, distributors may imprint their WIN business checks as being "Independent Distributor of WIN."

**D-5**  **Imprinted Business Cards or Letterheads.**  WIN distributors are not permitted to "create" their own business card or letterhead graphics if the WIN trade name and/or trademarks are used. Distributors may produce letterhead and business cards ONLY from approved WIN logo slicks. Only the approved WIN graphics version and wording are permitted.

**D-6**  **Company Literature.**  Only official WIN literature may be used in representing WIN products and/or the WIN Compensation Plan. Company literature may not be duplicated or reprinted without prior written permission from WIN.

**D-7**  **Print and Electronic Advertising.**  WIN distributors are permitted to advertise in print and electronic media if the material advertised is related only to their specific WIN distributorships and complies with all applicable laws and regulations, WIN's Advertising Policy and the WIN Ethics, Rules & Regulations. WIN distributors shall not include the WIN Corporate address or telephone numbers, or the WIN Corporate fax number (refer to **Rule D-16 Online Advertising,** for exceptions) in any advertisements.

**D-8**  **Media Interviews.**  Distributors are prohibited from granting radio, television, newspaper, tabloid or magazine interviews, or using public appearances, public speaking engagements or making any type of statement to the public media to publicize WIN, its products or their individual WIN business except with the express, prior written approval of WIN (see **Rule H-3 Press Inquiries).**

**D-9**  **Endorsements.**  No endorsements by WIN officers or administrators may be alleged, except as communicated in WIN literature and communications.

**D-10**  **Independent Communications.**  Distributors, as independent contractors, are encouraged to distribute official WIN information to their respective downlines. WIN encourages the prudent distribution of WIN newsletters, training workshops and other organizational programs. In all events, a distributor must identify and distinguish between personal communications and the official communications of WIN.

**D-11**  **Medical Claims.**  No medical claim (expressed or implied) is to be made for any WIN product by any distributor. WIN recommends that customers under a physician's care or suffering from any chronic disorder or other medical problems should consult with their physician before undertaking any changes in diet or when beginning any nutritional program. WIN nutritional products are designed for *augmentation*, not replacement. WIN encourages all WIN customers to seek the advice and counsel of nutritional and healthcare professionals.

**D-12**  **Independent Distributor Services.**  WIN provides every distributor who generated any income as a WIN distributor with management and training communications, timely delivery of product and sales materials, and a computer report of sales made in their marketing group for the calendar period in which commissions and overrides are earned and paid.

**D-13**  **Repackaging Prohibited.**  Distributors are prohibited from repackaging and/or removing WIN product from original containers for resale purposes.

© 1993-1998 Wellness International Network, Ltd.                                       rev. 5/12/99

**D-14**   **Recordings.** Distributors shall not produce or reproduce for sale any personal or WIN produced audio or video taped material detailing the WIN opportunity or product presentations, events or speeches, including conference calls. Video and/or audiotaping of WIN meetings and conferences are strictly prohibited. Still photography is allowable at the discretion of the meeting host.

**D-15**   **Telephone Answering.** Distributors may not answer the telephone by saying "WIN," or in any other manner that would lead the caller to believe that he or she has reached WIN.

**D-16**   **Online Advertising.** Distributors are permitted to establish online web sites and home pages on the facilities of their choice given that:
1) the information stored on those locations is related only to their specific distributorships and/or interests while complying with WIN's Rules & Regulations; and
2) they adhere to the following:
   a) Except as provided in sub-section 2(b) herein, distributors are not permitted to promote or use any WIN trademarks, training aids or copyrighted materials on online web sites or home pages not produced by WIN. Distributors who wish to provide users with the aforementioned company-specific information must:
      i) access the WIN corporate web site at **"www.winltd.com";** and
      ii) create direct links from their home pages to the specific pages on **www.winltd.com.** The page names may be acquired upon entering the WIN site and accessing the pages desired. WIN reserves the right to amend the page names from time to time, with or without notice. Office2office℠ services are password protected and, therefore, may not be linked to distributor web sites or home pages.
      iii) refrain from distributing any materials printed from the WIN corporate web site. Copies may be printed for personal use only. Reproduction for any other purpose is strictly prohibited according to copyright law.
   b) Distributors are not permitted to promote or use the "Wellness International Network, Ltd." or "WIN" names, or the corporate logo on online web sites or home pages, **UNLESS:**
      i) they have included on the home page the words, "If you object to this page or its contents, please fax your comments to Distributor Relations & Compliance at (972) 389-3060."; and
      ii) they have included on each page both their name and the title, "distributor of Wellness International Network, Ltd.," which comply with the following:
         aa) the words are visible immediately upon accessing the home page, without having to scroll, at 640 x 480 resolution on a 14-inch monitor;
         bb) the words are easily legible and the color of the lettering is that which is readily distinguishable from the color of the page on which it is displayed; and
         cc) the words are afforded no less prominence in font size than that given to any other information on the page, apart from the heading of the page.

**D-17**   **Internet Search Engines and Directory Listings.** Distributors are permitted to use the WIN trade name in advertising their web site addresses on the Internet. Recognizing that more than one distributor may wish to register on the same search engine or directory listing, the following must be included when registering the site:

**Wellness International Network (WIN), Independent Distributor**

# E. PAYMENT OF OVERRIDES, ROYALTIES AND BONUSES

**E-1**   **Distributor Agreement.** No business may be transacted with WIN unless and until an Distributor

Application is submitted, accepted by WIN and in effect (e.g. renewal). Thus, Royalties and Bonuses will not be paid until a completed Distributor Agreement has been received and accepted by WIN. This Agreement may be executed in one or more counterparts, excluding the WIN UK Distributor Agreement, all of which shall be considered one and the same Agreement and shall become effective when one or more counterparts have been signed.

E-2     **Calendar Period.**  Royalties, Bonuses and achievement levels are calculated based on a volume month.  A calendar period runs from the first day of each volume month through the last day of each volume month, as determined by WIN, in its sole discretion.

E-3     **Royalty and Bonus Payment Date.**  Payment of WIN Royalties and Bonuses will be made by WIN via Direct Deposit on the 25th day of each calendar month, for products purchased from WIN during the previous volume month, all in accordance with the WIN Compensation Plan.  As an example, payments of Royalties and Bonuses for products sold by WIN during the volume month of January 1st through February 1st are deposited on February 25th.  Should the 25th day of the month fall on a legal holiday or weekend, payments will be deposited the next regularly scheduled business day.

Royalties and Bonuses will be delayed, and possibly forfeited, on any Will-Call order remaining at WIN for more than seven calendar days from the date the order was processed, as per **Rule F-11 Timely Product and Materials Delivery.**

E-4     **Michigan Retail Sales Required.**  Royalties and Bonuses may be advanced by WIN to Michigan distributors at the time of the wholesale sale of the product by WIN.  An advance is not earned, however, until a retail sale of this product occurs.  If a retail sale of the product does not occur within six (6) months of the wholesale sale by WIN, the advance must be returned to WIN.

E-5     **Direct Deposit.**  All distributors must be enrolled in WIN's Direct Deposit Program in order to receive payment of Royalties and Bonuses.  A $6.00 processing fee will be deducted for each deposit made.  Should WIN be unable to deposit earnings into any distributor's account due to inaccurately provided bank information by the distributor, WIN will attempt to redeposit these funds, upon notification by WIN's financial institution of such error, to the corrected bank account at a fee of $25 per retransmission.

Enrollment in the Direct Deposit Program may be obtained by submitting a completed Direct Deposit form to WIN, accompanied by a voided check or savings deposit slip.  As funds may be deposited only into those accounts, which bear the names of, WIN distributors, all voided checks and/or savings deposit slips must be preprinted with the names, addresses and telephone numbers of the distributor on record.

Any changes made to the existing information on file require the completion of a Direct Deposit form representing the notarized signatures of all authorized parties in the distributorship entity, accompanied by an updated voided check or savings deposit slip as well as any applicable documents required by **Rule B-7 Corporations, Partnerships and Trusts and Rule B-8 Assumed Names.**

E-6     **Currency Restrictions.**  Royalties and Bonuses will be paid in the following currencies.

1)  Distributors residing in the United States will be paid in U.S. dollars.
2)  Distributors residing in the United Kingdom will be paid in pound sterling.
3)  Distributors from all other "open market" countries will be paid in the currency of their country. However, only Independent Marketing Distributors who have given WIN written notification, may elect to be paid in U.S. dollars.

© 1993-1998 Wellness International Network, Ltd.                    RR-12

# F. PURCHASE AND SALE OF PRODUCTS

**F-1**    **No Purchase Required to Become an Independent Distributor.** No product purchase is required to become a WIN distributor. Additionally, only distributors who have had their Distributor Application accepted by WIN may buy at a discount directly from WIN.

**F-2**    **Stockpiling Discouraged.** The success of WIN depends on retail sales to the ultimate consumer; therefore, all forms of stockpiling are discouraged. WIN recognizes that distributors may wish to purchase products in reasonable amounts for their own use and for the purpose of provisioning new distributors as they are sponsored. However, WIN strictly prohibits the purchase of products in unreasonable amounts solely for the purpose of qualification or advancement in the Compensation Plan.

**F-3**    **Michigan Purchase Limitations.** WIN maintains a policy and practice whereby WIN shall, within the first 30 days following acceptance by WIN of the distributor's application, restrict the dollar volume of purchases to be made by a newly approved Michigan distributor to no more than a total of $2,000 wholesale cost of WIN products and sales aids, exclusive of verified sales to consumers. Verification of sales to consumers shall be made in writing identifying the individual consumer and quantity of products sold to each consumer.

**F-4**    **70 Percent Rule.** WIN strictly enforces the provisions of product repurchases. In order to purchase product from WIN, the distributor must certify on the product order form that he/she has sold, sampled (to induce sales to retail customers) or consumed* at least 70 percent of all products previously purchased.

     *Excludes Michigan residents.

**F-5**    **70 Percent Rule Enforcement.** WIN has adopted, implemented, maintained and enforced in its distribution system a policy and practice whereby WIN will require distributors to provide verification of their compliance of **Rule F-4 70 Percent Rule** and **Rule F-6 Retail Sales Rule.** WIN shall randomly select a percentage of participants who are receiving commissions, bonuses, or similar compensation who will then be required to complete and return a Verification Survey. WIN shall personally contact customers of these participants to verify sales reported by the participants. If selected, participation in this program is not optional.

**F-6**    **Retail Sales Rule.** In order to qualify for Royalties and Bonuses, a distributor who has achieved Manager or above must certify by completion of the Retail Sales Rule Compliance Form that he/she has made at least five (5) retail sales to five (5) different retail customers in the volume period in which Royalties were earned. This form must be submitted to WIN by the 5th day of each volume month. WIN distributors are responsible for their own record keeping and should be prepared to submit these records, upon request, to WIN.

**F-7**    **Retail Sales Report.** Managers and above are responsible for reporting the products purchased from WIN have been sold at retail or sampled. Royalties and Bonuses advanced on products, which are not certified as sold at retail within six (6) months of the wholesale sale by WIN, must be returned to WIN.

**F-8**    **Direct Purchase.** All distributors may purchase product needs directly from WIN. Should an Associate choose to obtain product from his/her upline Manager or above, no commissions or overrides will be paid by WIN on such transactions. Associates may, however, credit such transactions towards fulfillment of their Manager qualifications.
NOTE: Qualifications must be fulfilled as outlined in WIN's Compensation Plan.

**F-9**    **Payment Options.** Purchases may be paid by:

     1)   Money order;
     2)   Cashier's check;
     3)   Bank wire transfer. Product order and copy of bank's wire transfer verification must be faxed to WIN;

4) MasterCard/VISA. A Credit Card Authorization Form must be on file prior to making a credit card purchase. New Credit Card Authorization Forms submitted to WIN require 24 hours for processing. Credit card orders may only be placed via WIN Access™ and Office2office℠;

5) Personal check. Personal checks will be accepted up to $5,700 per order/per day ONLY and must be signed by the distributor listed on the order form. Personal checks must be preprinted with the name, address and telephone number of the signator. No P.O. Boxes for return address and no third-party checks will be accepted. All checks returned due to insufficient funds are subject to a $25 returned check fee or at the highest rate allowed by law, whichever is greater. Any distributor who has two or more returned checks within a six-month period will be placed on a cash-only status. Any violation of these terms will result in either a fifteen (15) business day delay in shipping and the automatic forwarding of the order to the next volume month, or the cancellation of the order in its entirety; or

6) Bank Draft. For bank draft eligibility, the following rules must apply:
   a) Distributor must be enrolled in the Direct Deposit Program.
   b) Distributor must reside in the United States.
   c) Distributor must have received Royalties and Bonuses totaling $5,000 or more each month during the last six pay periods.

Enrollment in the Bank Draft Program may be obtained by submitting written notification to WIN.

**NOTE:  No orders will be shipped without prior payment.**

**F-10  Shipping Costs.** It is the ordering distributor's sole responsibility to indicate (a) method and means of shipping and (b) destination address. The methods available are stated on each order form and the prepaid costs, if selected, can be calculated according to the applicable percentage of the retail value of the order.

**NOTE:** Subject to applicable law should the receiving party of any order refuse delivery and the shipment be returned, the ordering distributor's status will be made "inactive" pending resolution of the delivery refusal, and may be grounds for termination.

**F-11  Timely Product and Materials Delivery.** Upon clearance of payment, WIN processes for shipment or pick-up the products and materials ordered. If an item is temporarily not available (TNA), the consignee is notified by way of the packing list included with the shipment. Should a TNA occur, the item(s) will be shipped as soon as available and usually within ten (10) days of the date the original order and payment was received. If a shipping discrepancy occurs (not including items that are TNA), the consignee must mail or fax a Shipping Discrepancy Form to WIN's Corporate Office within thirty (30) days of the invoice date. Upon receipt of the form by WIN, a weight analysis will be conducted to verify the discrepancy. Inconclusive data will result in the replacement of the reported missing item(s) at no additional shipping costs.

Any Will-Call order placed with WIN must be picked up within seven (7) calendar days from the date the order was processed. A consignee's failure to retrieve a Will-Call order within the specified period will automatically result in the order being moved forward one volume month. Will-Call orders not retrieved within thirty (30) calendar days will result in cancellation of the order. Distributor's who fail to take delivery of will call orders may be subject to disciplinary action including, but not limited to termination.

**F-12  Damaged Goods.** WIN will take full responsibility for any damages that occur during the shipment of goods to the distributor; provided, however, that WIN reserves the right to inspect such alleged damaged goods at its principal place of business upon their return. If WIN determines the goods to be damaged, then the damaged goods that are returned to WIN within thirty (30) days of the invoice date will be replaced by WIN. However, no product(s) should be returned to WIN before prior approval is sought and received. In order to assure that a replacement will be issued, strict compliance to the following procedures is required:

1) If the shipment is visibly damaged upon receipt, the consignee must refuse delivery and contact WIN immediately.
2) If the shipment is found to be damaged after the delivery has been made, the consignee must:
   a) Save the damaged product(s) or box(es);
   b) Submit a completed Quality Control Form to WIN;
   c) Obtain a Return Merchandise Authorization (RMA) number. This number will be issued, via WIN Access™, 24 hours after WIN's receipt of the Quality Control Form; and
   d) Return the damaged goods to WIN. Any goods mailed to WIN must have the RMA number prominently displayed on each shipping carton. Upon receipt of the damaged products, WIN will promptly dispatch a replacement order.

**NOTE:** A distributor's account will be credited for shipping charges incurred only when a postage receipt accompanies the returned shipment. Any product returns received without prior approval will be refused. Furthermore, an unauthorized return may result in the status of that distributor to be made "inactive."

**F-13**    **Price Changes.** All WIN product and literature prices are subject to change without prior notice.

**F-14**    **Receipts; Retail Pricing.** WIN distributors will provide all retail purchases of WIN products with a written WIN Retail Sales Receipt Form. Although WIN provides a *suggested retail price* as a guideline, distributors may sell WIN products at whatever retail price they and their customers agree upon.

**F-15**    **Tax Exemption.** If a distributor wishes to change the tax status of their distributorship to tax exempt, they will be required to submit to WIN a written request accompanied by an original, notarized copy of the State Tax Exempt certificate. The State Tax Exempt certificate must include the name and address of the distributorship as it appears on record with WIN. All distributors are required to follow the guidelines pursuant to **Rule B-13 Taxation**, when reporting taxes for federal, state and local purposes.

**NOTE:** distributors who are shipping orders to California, Colorado, Iowa, Kansas, and Texas are not eligible for tax exemption.

**F-16**    *Intentionally omitted*

**F-17**    *Intentionally omitted*

**F-18**    *Intentionally omitted*

# G. RETAIL GUARANTEE AND REFUND POLICY

**G-1**    *Intentionally omitted*

**G-2**    **Defective Goods.** WIN will replace, within thirty (30) days of the invoice date, any product(s) determined to be defective provided, however, that WIN reserves the right to suspect such alleged defective goods at its principal place of business upon their return. However, no products should be returned to WIN before prior approval is sought and received. In order to assure that replacement of product will be issued, strict compliance to the following procedures is required. In the event a distributor is required to repurchase non-conforming goods from a retail customer, then the following procedures must be followed before WIN will repurchase such non-conforming product from a distributor:

1) A completed Quality Control Form, accompanied by proof of payment and a copy of the invoice or packing slip, is submitted to WIN stating the reason for the request;
2) A Return Merchandise Authorization (RMA) number is issued, after 24 hours, to your WIN Access™ mailbox;

3)  The defective product(s) are returned to WIN. Any goods mailed to WIN must have the RMA number prominently displayed on each shipping carton. Upon receipt of the defective products, WIN will promptly dispatch a replacement order; and

4)  WIN will not replace any product previously certified as sold under the 70% Rule.

**NOTE:** A distributor's account will be credited for shipping charges incurred only when a postage receipt accompanies the returned shipment. Any product returns received without prior approval will be refused. Furthermore, an unauthorized return may result in the status of that distributor to be made "inactive."

**G-3**    **Resignation Returns.** Except where required by applicable law, WIN has the option to not repurchase products. However, all accepted returns by distributors require voluntary resignation as outlined in **Rule C-6 Voluntary Resignation.**

**G-4**    **Michigan Product Return Policy for New Independent Distributors.** For products offered for repurchase by a new participant within thirty (30) days of the date WIN accepted distributor's application, the repurchase price shall be the full list wholesale price paid to WIN for the products and sales aids being returned. Products must be in re-usable and resaleable condition. Timely compliance with **Rule C-6 Voluntary Resignation** must occur before any products may be offered for repurchase by WIN.

**G-5**    **Michigan Policy for Product Returns.** For products purchased from WIN which have not been verified as having been sold by a distributor and which are in reusable and resaleable condition and are offered for repurchase within ninety (90) days of their date of purchase, the repurchase price shall be 90 percent of the wholesale price of the products paid by the distributor, including sales tax, less all commissions, bonuses and rebates received by the distributor from WIN as a result of products purchased from WIN. This deduction shall not include bonuses and commissions earned by the distributor as a result of resale to end-users. Timely compliance with **Rule C-6 Voluntary Resignation** must occur before any products may be offered for repurchase by WIN.

**G-6**    **Buyer's Right to Cancel.** Federal law empowers a buyer to cancel certain sales without penalty prior to midnight of the third business day after the transaction. This rule covers retail consumer sales of $25 or more that occur away from the seller's main office. The WIN Retail Sales Order Form contains all legally required notices. **The buyer must sign it and two copies must be given to the buyer on every sale.** In addition, the distributor must orally inform the buyer of the three-day right to cancel at the time the buyer signs the contract of sale or purchases the goods.

**G-7**    **Independent Distributor's Responsibility.** Distributors must comply with all state laws regarding repurchase of product. Subject to such laws, as in matter of policy, if a retail customer mails or delivers to a distributor a valid notice of cancellation prior to midnight on the third business day after ordering or purchasing the product, the distributor must honor it. If the buyer has taken delivery of any goods, they must be returned with the notice in substantially as good condition as when delivered. Within ten (10) business days after receiving the notice, the distributor must refund all payments made under the life of the contract.

**G-8**    **Commission Debits.** Upon receiving returned merchandise, WIN reserves the right to debit upline distributors in the amount of the Discount Profits, Royalties and/or Bonuses paid on the products returned to WIN and, in the event a distributor is no longer a distributor or is not entitled to receive commissions equal to or greater than the amount of the debit, then WIN reserves the right to institute an action to recover any monies due and owing.

# H. GENERAL PROVISIONS

**H-1**    **Recordkeeping.** WIN encourages all its distributors to keep complete and accurate records of all their business dealings.

**H-2**   **Income Claims.**  No false or misleading income projections, including those based solely on mathematical projections or "ideal projections" of the WIN Compensation Plan, may be made to prospective distributors. A distributor of WIN may not represent his/her own incomes as indications of the success assured to others, since income success has many variables.

**H-3**   **Press Inquiries.**  Distributors may not solicit media attention or respond to media inquiry on behalf of WIN, nor are any distributors authorized to give personal testimonials or product information to the media, except as authorized by WIN. All media inquiries should be immediately referred to the attention of the "WIN Press Representative" in WIN. Their prompt response to all media inquiries will assure accurate reporting regarding WIN.

**H-4**   **Governmental Endorsement.**  Federal and state regulatory agencies do not approve or endorse direct selling programs. Therefore, distributors may not represent or imply, directly or indirectly, that the WIN program has been approved or endorsed by any governmental agency.

**H-5**   **Refund Provisions, Training Materials.**  All training materials are non-refundable except where required by applicable state law.

**H-6**   **Registration Compliance.**  If and when it should occur that WIN, as a Texas limited partnership, is required to register itself in any other state based on that state's requirements, WIN will determine the best means and by which method compliance should occur.

**H-7**   **Product Liability Insurance.**  WIN manufacturers certify to WIN that each carry in their country of manufacture $1 million product liability insurance.

**H-8**   **Amendments.**  WIN reserves the right to amend the Rules & Regulations set forth herein, its wholesale or suggested retail prices and Compensation Plan, as it deems appropriate. Amendments will be communicated directly to all distributors through official WIN publications or other means. Amendments are effective and binding on all distributors as of the date of issue.

**H-9**   **Non-Waiver Provision.**  No failure of WIN to exercise any power under these Rules & Regulations or to insist upon strict compliance by a distributor with any obligation or provision herein, and no custom, practice or course of dealing of the parties at variance with these Rules & Regulations, shall constitute a waiver of the company's rights to demand exact compliance with these Rules & Regulations. Waiver by the company can be affected only in writing by an authorized officer of the company that expressly waiver enforcement of or the exercise of any power under these Rules & Regulations. The company's waiver of any particular default by a distributor shall not affect or impair the company's rights with respect to any subsequent default, nor shall it affect in any way the rights or obligations of any other distributor. Nor shall any delay or omission by the company to exercise any right arising from default affect or impair the company's rights as to that or any subsequent default.

**H-10**   **Compliance With Governmental Regulations.**  In the event any legislation, rule, judgment or order is enacted, adopted or issued which commercially frustrates WIN's purpose in entering into an Distributor Agreement or its ability to perform, WIN has the right, and sole discretion, to terminate immediately the relationship between WIN and a distributor pursuant to an Distributor Agreement or to cease to perform or to unilaterally modify that portion of the Distributor Agreement and these Rules & Regulations which have been so affected.

**H-11**   **Force Majeure.**  All distributors understand and acknowledge that WIN shall not be liable for any loss, damage, detention, delay or failure to perform in whole or in part resulting from causes beyond WIN's control, including but not limited to, fires, strikes, insurrections, riots, embargoes, delays in

transportation, inability to obtain supplies or requirements or regulations of any governmental authority or any other civil or military authority.

**H-12**   **Entire Agreement.**  These Rules & Regulations, together with the Distributor Agreement, embody the entire agreement and understanding between WIN and any distributor relating to any and all relationships between WIN and any distributor, including without limitation, the subject matter hereof, and supersedes all prior agreements and understandings between WIN and any distributor, whether oral or in writing, and there are no warranties, representations or other agreements between the parties in connection with their relationship except as specifically and expressly set forth herein or in the Distributor Agreement.

**H-13**   **No Reliance.**  In executing an Distributor Agreement, each distributor expressly represents and warrants and does thereby state and represent that no promises or agreements which are not expressed in the Distributor Agreement and/or Rules & Regulations have been made to such distributor and that each distributor expressly disclaims reliance upon any statement or representation of any agent, representative or employee of WIN.

**H-14**   **Construction and Interpretation.**  (a) The titles and subtitles of various sections and subsections of these Rules & Regulations are inserted for convenience and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions of these Rules & Regulations, (b) the language used in these Rules & Regulations shall in all cases be construed simply according to its fair meaning, (c) it is agreed that if any provision of these Rules & Regulations is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, the provision shall have the meaning which renders it valid.

**H-15**   **Severability.**  In the event that any of the provisions of these Rules & Regulations and/or the Distributor Agreement shall be held to be invalid, illegal or unenforceable, for any reason whatsoever, such invalidity, illegality or unenforceability shall not affect any of the other provisions hereof or in the Distributor Agreement, and these Rules & Regulations and/or the Distributor Agreement shall be construed as if such invalid, illegal and unenforceable provision had never been contained therein.

**H-16**   **Reservations of Rights.**  WIN expressly reserves any and all rights regarding the formulation and availability of products and services and, therefore, WIN has the sole and absolute right to modify, reduce, increase or alter the formulation and/or the availability of its products and services.  In addition, WIN expressly reserves any and all rights regarding the publication of and representations, if any, contained in any literature released by WIN, the compensation plan offered by WIN and any other decision related to the business opportunity or products and services of WIN.  WIN reserves any and all rights related to, directly or indirectly, product types, quantity, formulations, labeling, packaging, prices and market availability.

**H-17**   **Arbitration; Venue; Governing Law.**  Any dispute or claim arising under, out of or in connection with the Rules & Regulations and/or the Distributor Agreement, or the relationship between a distributor and WIN, shall be resolved by binding arbitration conducted in accordance with the rules of the American Arbitration Association, which arbitration shall be conducted in Dallas County, Texas.  These Rules & Regulations, as well as the Distributor Agreement shall be construed and enforced in accordance with the laws of the State of Texas, the United States of America, without regard to provisions governing conflicts of laws.  Distributors hereby irrevocably and unconditionally submit themselves and their property to non-exclusive jurisdiction of any arbitration panel convened in Dallas, Dallas County, Texas, and further irrevocably and unconditionally waive, to the fullest extent that a distributor may legally and effectively do so, any objection that such distributor may have now or hereafter to such venue, including the defense of an inconvenient forum.

   1)   Arbitration Jurisdiction.  Any dispute, controversy or claim arising under, out of, or in connection with the Rules & Regulations and/or Distributor Agreement, or the relationship between a distributor and WIN, including without limitation, any claim that these Rules & Regulations and/or the Distributor Agreement, or any part thereof, is invalid, illegal or otherwise voidable

or void, shall be submitted to final and binding arbitration before, and in accordance with, the Commercial Rules of the American Arbitration Association, which arbitration shall be conducted in Dallas County, Texas, and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this subsection shall not (a) apply to disputes, controversies or claims in which the monetary damage claim exceeds One Hundred Thousand Dollars ($100,000), inclusive of costs and attorneys' fees and/or (b) be construed to limit any rights which WIN may have to apply to any court of competent jurisdiction for injunctive or other provisional relief. This arbitration provision shall be deemed self-executing, and in the event that either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party notwithstanding said failure to appear.

2)     Non-Arbitration Jurisdiction. With respect to any dispute, controversy or claim that is not subject to arbitration under H-17(a), each distributor hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Texas state court or federal court of the United States of America sitting in Dallas, Dallas County, Texas and any appellate court therefrom in any action or proceeding arising under, out of, or in connection with the Rules & Regulations and/or the Distributor Agreement, or the relationship between a distributor and WIN, including without limitation, any claim that the Rules & Regulations and/or the Distributor Agreement, or any part thereof, is invalid, illegal or otherwise voidable or void.

3)     Venue. Each distributor hereby irrevocably and unconditionally submits themselves and their property to the non-exclusive jurisdiction of any arbitration panel convened, or a court of competent jurisdiction in Dallas, Dallas County, Texas, whichever is applicable, it being acknowledged that the relationship between any distributor and WIN is performable, in part, in Dallas County, Texas, and further irrevocably and unconditionally waives, to the fullest extent that a distributor may legally and effectively do so, any objection that such distributor may have now or hereafter to such venue, including the defense of an inconvenient forum.

4)     Governing Law. These Rules & Regulations, as well as the Distributor Agreement, shall be construed and enforced in accordance with the laws of the State of Texas, the United States of America, without regard to provisions governing conflicts of law.

**H-18**     **No Personal Liability.** All covenants, duties, obligations and liabilities of WIN to a distributor shall be the sole responsibility of WIN and shall be recourse solely to WIN and its assets. Under no circumstances whatsoever shall any officers, directors, partners (general or limited), shareholders, shareholders of any general or limited partnerships, employees, representatives or affiliates of WIN be deemed personally liable under these Rules & Regulations and/or the Distributor Agreement for any such covenants, duties, obligations or liabilities.

**H-19**     **Limitation of Liability.** All distributors understand and agree that the liability of WIN for any claim whatsoever related to the relationship between WIN and a distributor, including any cause of action sounding in contract, tort or strict liability, shall not exceed, and shall be limited to, the amount of unsold WIN product inventory owned by such distributor; thus, the sole liability, if any, of WIN shall be to pay the monetary equivalent of such unsold WIN product inventory owned by such distributor. Under no circumstances whatsoever shall WIN be liable to any distributor for any special, exemplary, incidental, indirect or consequential damages, including costs, revenues or lost profits, resulting from, arising out of, or related to any relationship between WIN and any distributor.

**H-20**     **Non-UCC Application.** The Distributor Agreement does not involve the sale of goods and, as such, any jurisdiction's uniform commercial code (collectively, the "UCC") shall have no application to the Distributor Agreement and the party's rights thereunder; provided, however, that in the event that a distributor chooses to purchase WIN's goods, products and services for resale after execution and acceptance of an Distributor Agreement, such purchases may be subject to applicable provisions of the UCC.

# US PRODUCT ORDER FORM

Wellness International Network, Ltd.
5800 Democracy Drive • Plano, Texas 75024
http://www.winltd.com
Phone: 972.312.1100 (Press 4 for WIN Access™)
Fax: 972.943.5260

**Operating Hours (CST), Monday thru Friday:**
Corporate Office: 9:00 a.m. - 6.00 p.m.
Distributor Services: 9:00 a.m. - 5.00 p.m.
Warehouse Will Call: 1:00 p.m. - 3:30 p.m.
WIN Access™ and Office2office™: 24-hour ordering & information

## 1. DISTRIBUTOR INFORMATION:

WIN ID # 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
Last Name: BISMALA LLC
First Name:
Phone #: 920-887-3583
Fax #: 920-887-3795

## 2. SHIP TO: (No P.O. Boxes)

Last Name: KHAN
First Name: WAQAR
Address: 618 LAKESHORE DR
City, State: BEAVER DAM, WI
Zip Code: 53916-
Phone #: 920-887-3583

## 3. VOLUME CREDIT

Today's Date: 6/25/00
Sales Volume Month: JUNE  Year: 2000
Unless otherwise stipulated above, this order will be placed in the current volume month based on date received at WIN Corporate Office.

## 4. 70% RULE & RETAIL SALES VERIFICATION

ORDER WILL NOT BE PROCESSED WITHOUT SIGNATURE.
In order to qualify for Overrides, Royalties and Bonuses, I certify that I have sold, consumed or sampled (to induce sales to retail customers) at least 70% of all products previously purchased from Wellness International Network, Ltd. as per WIN's Rules & Regulations (70 Percent Rule). I also certify that, during the preceding month, I have made at least five retail sales. I have kept complete records of these sales, and I am prepared to submit these records, upon request, to WIN, LTD. as per WIN's Rules & Regulations (Retail Sales Rule). *not applicable in the state of Michigan

Signature X _____  Date _____

## 5. SHIPPING/HANDLING

Check one and enter appropriate amount in Box E. If left blank, order will be shipped Ground.
☑ Ground: 3% of Box C or $7.00 – which ever is greater. AK, HI and PR: not applicable.
☐ 3 Day: 3.5% of Box C or $10.00 – which ever is greater. AK, HI and PR: not applicable.
☐ 2nd Day: 4% of Box C or $15.00 – which ever is greater.
☐ Next Day: 6% of Box C or $25.00 – which ever is greater.
☐ Will-Call: (Order picked up at Corporate Office – no shipping charge; must pay local sales tax.)

☆ SHIPPING TAX
Applicants of AR, CO, CT, DC, FL, GA, HI, ID, IN, KS, MA, MI, MO, NE, NV, NM, NY, NC, ND, OK, PA, RI, SC, SD, TN, TX, UT, VA, WV, WI, WY— applicable state tax.

## 6. METHOD OF PAYMENT

☐ Cashier's/Certified Check/Money Order
☑ Wire Transfer:
Distributor's Bank: BANK ONE
Amount of Wire: 242,901
WIN Acct. #00050237 • ABA Routing #113010547 • Attn: Dallas Office

☐ Credit Card/Debit Card [VISA] [MC] First-Time Orders Only
Card Number:
Exp. Data:
Name: As It Appears on Card
Card Holder's Signature:

CREDIT CARD/DEBIT CARD POLICY
a) Distributor Application with completed credit card/debit card authorization must accompany this order. All subsequent orders must be processed via WIN Access™ or Office2office™.
b) I authorize the credit card/debit card listed above to be used for present and future purchase obligations to Wellness International Network, Ltd. (WIN). I agree to perform the obligations set forth in the card holder's agreement with the issuer and to be governed by WIN's Rules and Regulations. I understand that NO REFUNDS OR EXCHANGES will be granted.

☐ Personal Check # _____
PERSONAL CHECK POLICY
a) WIN accepts checks up to $3,300 ONLY. (One check per order per day.)
b) Checks must be signed by the Independent Distributor listed above and must be pre-printed with the name, address and telephone number of the signator. No P.O. Boxes or return address or third party checks will be accepted.
c) $25 fee on all returned checks.
Any violation of these terms may result in a 15 business day delay in shipping or cancellation of this order.

Order Form 530

RESIGNATION RETURNS
WIN, LTD ONLY REPURCHASES PRODUCT IN ACCORDANCE WITH APPLICABLE STATE LAW.

## 7. NON-DISCOUNTABLE ITEMS (Column 1)

| Code # | Description | Retail Price | Qty. | Total |
|---|---|---|---|---|
| 1. 135009 | Sample Case | 740 | 6 | 4440 |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18. | | | | |

Non-Discountable Items Total (Column 1)  4440

## 8. DISCOUNTABLE ITEMS (Column 2)

| Code # | Description | Retail Price | Qty. | Total |
|---|---|---|---|---|
| 1. 115001 | PhytoVite | 83 | 432 | 35,856 |
| 2. 115002 | Sleep Tite | 53 | 216 | 11,448 |
| 3. 131004 | BioLean | 70 | 1888 | 132,160 |
| 4. 131005 | BioLean Free | 70 | 240 | 16,800 |
| 5. 132002 | Lipo Trim | 73 | 264 | 19,272 |
| 6. | | | | |
| 7. 234001 | Std Order 2K | 2010 | 40 | 80,400 |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18. | | | | |

## 9. TOTALS

| | | |
|---|---|---|
| A. Discountable Items Total (COLUMN 2) | | 295,936 |
| B. Non-Discountable Items Total (FROM COLUMN 1 ABOVE) | | 4,440 |
| C. Subtotal: (A + B) | | 300,376 |
| D. Tax: ( ___ % x C) | | 6,008 |
| E. Shipping & Handling: REFER TO SECTION 5 | | 9,011 |
| F. Shipping Tax: ( ___ % x E) REFER TO SECTION 5 | | |
| G. Subtotal: (C + D + E + F) | | 315,395 |
| H. Less Discount: ( ___ % x A) DISCOUNTABLE ITEMS ONLY | | 72,494 |
| I. Grand Total: (G – H) | | 242,901 |

EXHIBIT
11

PENGAD-Bayonne, N.J.

1999 Wellness International Ltd.  rev. 8/9/99